UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DAWSON VALLEE | * | NO. 2:20-CV-01571 |
| | * | |
| PLAINTIFF, | * | JUDGE: SARAH S. VANCE |
| | * | |
| VERSUS | * | MAG. JUDGE: KAREN WELLS ROBY |
| | * | |
| CROWN EQUIPMENT CORPORATION OF | * | SECTION: "R" (4) |
| OHIO D/B/A CROWN LIFT TRUCKS, GEORGE | * | |
| BORDELON, AND ADAM GIROIR | * | |
| | * | |
| DEFENDANTS. | | |

---

**CROWN EQUIPMENT CORPORATION'S**
**MEMORANDUM IN SUPPORT OF MOTION IN LIMINE**
**TO EXCLUDE PROPOSED DESIGN OPINIONS OF DR. JOHN MEYER**

---

MAY IT PLEASE THE COURT:

Defendant, Crown Equipment Corporation ("Crown"), submits this Memorandum in Support of its Motion to Exclude the Proposed Design Opinions of Plaintiff's expert, Dr. John Meyer, pursuant to Federal Rules of Evidence 104(a) and 702. Dr. Meyer does not possess the requisite experience or qualifications to offer an expert opinion in the field of fork-lift or stand-up rider lift truck *design.* For this reason alone, his testimony must be excluded. Further, even if this Court were to find that Dr. Meyer was qualified to offer some type of "expert" testimony, his opinions must nevertheless be excluded because they do not meet the standards for relevance and reliability as required by Federal Rule of Evidence 702 and the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

## I.     RELEVANT FACTS AND PROCEDURAL HISTORY

Plaintiff, Dawson Vallee, brought this products liability action following an injury he sustained on May 3, 2019 while operating a Crown RM6000 stand-up rider lift truck in the

warehouse where he was employed.  The RM6000 is a type of forklift designed to allow the safe and efficient movement of palletized materials in warehouses and other facilities.  Unlike sit-down forklifts, where the operator is seated while operating the vehicle, stand-up rider lift trucks, like the RM6000, have an *open compartment* which is designed to allow operators to quickly and easily get on and off the truck while performing their day-to-day activities.  The Plaintiff had been trained and certified by his employer in the operation of the RM6000 and had utilized the lift truck without incident for three months before his accident occurred.  On the date of the accident, the Plaintiff intended to drive the RM6000 down an aisle in the warehouse when he lost control of its operation and it collided with a bollard.  Before the impact occurred, Plaintiff allowed his left foot to exit the confines of the operator compartment where it was crushed between the bollard and the side of the lift truck.

On May 1, 2020, Mr. Vallee initiated this action alleging that Crown Equipment Corporation was liable for (a) "[d]esigning and manufacturing a defective forklift including its instrumentalities and devices that caused shaking and loss of control"; (b) "[d]esigning and manufacturing a defective forklift, including its instrumentalities and devices that failed to [stop] the loss of control forklift; and (c) "[f]ailing to design and manufacture a forklift with safety measures including a safety door to prevent extensions of lower extremities beyond the lift during loss of control events as well as safety belts/harnesses to prevent extension of lower extremities beyond the lift during loss of control events."[1]

## II.   PROPOSED DESIGN OPINIONS OF JOHN MEYER

To support his claims for defective design against Crown, Plaintiff retained four (4) expert witnesses, including Dr. John Meyer.  On April 19, 2021, Dr. Meyer submitted an expert report in

---

[1] Rec. Doc. 1 -2, ¶ 3. Plaintiff further included an assertion of liability based on "Any and all acts of negligence including any and all other breaches of duty which may be proved at trial."

compliance with the provisions of FRCP 26 setting forth his opinions.[2] On July 2, 2021, Dr. Meyer

provided a supplemental expert report.[3] According to his written report, Dr. Meyer purports to

offer expert opinions on "how Mr. Vallee was caused to be injured,"[4] whether there is a connection

between the injuries and the design of the RM6000,[5] and whether the design "represents an

unacceptable risk of lower left leg injury."[6] On page 1 of Dr. Meyer's report he summarizes his

opinions as to the design of the RM6000:

> **Mr. Vallee suffered a crush injury to his left foot as a result of design defects in the Crown RM 6000 forklift he was operating that include the lack of a safety guard door and a brake pedal design that requires the operator to assume an unsafe and unstable position when applying the emergency foot brake. But for the design of the forklift, Mr. Vallee would not have been injured. There are reasonably available alternative designs that could have been utilized by Crown that would have virtually eliminated the risk of the injury suffered by Mr. Vallee. These alternative design – a safety door on the operator compartment and a brake design that discourages left foot movement – would not have negatively affected the utility of the forklift.[7]**

Dr. Meyer proposes three general concepts for how the design could prevent lower left leg injuries:

a door on the forklift, reprogramming the floor pedals, and the addition of a backrest operator

presence sensor.[8]

Dr. Meyer's opinions regarding the design of the RM6000 are inadmissible for multiple

reasons under Federal Rules of Evidence 104(a) and 702. First, he does not possess the requisite

---

[2] *See* Exhibit A, Expert Report of John Meyer, Ph.D, dated April 19, 2021.
[3] *See* Exhibit B, Supplemental Expert Report of John Meyer, dated July 2, 2021. This supplemental report simply added an additional section to his original report regarding the ANSI B56.1 committee.
[4] Exhibit B at p. 3
[5] *Id.*
[6] *Id.* at p. 128.
[7] *Id.* at p. 1; Dr. Meyer also opined that the lift truck should have incorporated a backrest senor as an additional "alternative design." *Id.* at p. 5. However, he acknowledged that since Mr. Vallee already had his back against the backrest that a backrest sensor would likely have had no impact on the outcome of the accident: **"Q. Okay. So if, though -- If we believe Mr. Vallee's testimony and his back was against the backrest, then having a backrest sensor would not have played any role whatsoever in the occurrence of this event, correct? A. If his back was up against a backrest sensor that was in place, then that is correct."** Exhibit C, Deposition of John Meyer, pp. 190-191. Accordingly, since the existence (or non-existence) of a backrest sensor could not have played a causative role in this accident, Dr. Meyer's opinion on this proposed "alternative design" will not be addressed in this motion.
[8] Exhibit B at p. 5.

experience or qualifications to offer an expert opinion in the field of fork-lift or stand-up rider lift truck *design.*  Second, Dr. Meyer's opinion testimony is inadmissible because he has failed to identify specific alternative designs for the product as required by the Louisiana Products Liability Act, La. R.S. 9:2800.51, *et. seq.* ("LPLA"). Third, Dr. Meyer's opinions are inadmissible because he has performed no testing of his proposed alternative designs (assuming he had any, which he conceded he does not).  Fourth, Dr. Meyer's opinions are inadmissible because they have not been published and subjected to peer review in any form.  Fifth, Dr. Meyer's opinions are inadmissible because they are directly contrary to the standards published by the American National Standards Institute (ANSI) and thus are not "generally accepted" in the relevant technical community.  Finally, Dr. Meyer's opinions are inadmissible because they are driven solely by litigation and a desire to meet the needs of the attorneys who retain him.

## III.   <u>LEGAL STANDARD AND BURDEN OF PROOF</u>

Pursuant to Federal Rule of Evidence 104(a), this Court is vested with the duty of deciding preliminary questions concerning the qualifications of witnesses and the admissibility of evidence. Federal Rule of Evidence 702 specifically governs the admissibility of expert opinion and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> **(b)** the testimony is based on sufficient facts or data;
> **(c)** the testimony is the product of reliable principles and methods; and
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702 (West 2021). Rule 702 has two major requirements. First, it requires that a witness must be "qualified as an expert by knowledge, skill, experience, training, or education" before being permitted to testify as an expert. *Id.* Courts look to formal education and training as

well as experiential background in determining whether a person qualified as an expert. *See, e.g.*, *U.S. v. Wen Chyu Liu*, 716 F. 3d 159, 168 (5th Cir. 2013); *Harris v. Stryker Spine*, 39 F. Supp. 3d 846, 851 (S.D. Miss. 2014).

The second major requirement of Rule 702 is that the expert must testify to "scientific, technical, or other specialized knowledge" that will "assist the trier of fact."  This is where the United States Supreme Court's landmark opinion in *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786 (1993) comes into play.  In *Daubert* the court held that "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant but reliable. *Id*. at 589.  Pursuant to F.R.E. 702, *Daubert* charged federal courts with the "gatekeeping role" of assessing proposed scientific evidence to determine **(1) scientific reliability** — "whether the reasoning or methodology underlying the testimony is scientifically valid"; and **(2) relevance or fit** — "whether that reasoning or methodology properly can be applied to the facts in issue." *Id*. at 592-93.  The *Daubert* standards were originally adopted by the Louisiana Supreme Court in *State v. Foret,* 628 So. 2d 1116, 1123 (La. 1993).

With respect to the ***reliability prong*** *of Daubert*, the Supreme Court noted that "the adjective 'scientific' [in F.R.E. 702] implies a grounding in the methods and procedures of science.  Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 590.  Thus, "in order to qualify as 'scientific knowledge' an inference or assertion must be derived by scientific method.  Proposed testimony must be supported by appropriate validation, i.e., 'good grounds' based on what is known." *Id*.  Making this assessment, the Supreme Court in *Daubert* identified the following non-exclusive factors the trial court should consider: (1) whether the theory "can be (and has been) tested"; (2) whether it "has been subjected to peer review and publication;" (3) "the known or potential rate of error"; (4) "the existence and maintenance of standards controlling the

techniques operation"; and (5) whether the theory has "[w]idespread acceptance" in the relevant scientific community." *Id*. at 593-94.

Another significant factor to be considered is whether the expert is proposing to testify about matters drawing naturally and directly out of research conducted independent of litigation, or whether he has developed his opinions expressly for the purpose of testifying." *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("*Daubert* II"). That an expert testifies based on research he has conducted independent of litigation "provides important, objective proof that the research comports with the dictates of good science." *Id*.; *Cabrera v. Cordis Corp.,* 134 F.3d 1418 (9th Cir. 1998); Peter W. Huber, *Galileo's Revenge: Junk Science in the Courtroom,* 206-09 (1991). Another key factor is whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting." *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997). *See Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167, 1176 (1999) (*Daubert* requires the trial court to assure itself that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

With respect to the ***relevance prong*** of *Daubert*, FRE 702 provides that the expert testimony must "assist the trier of fact." The Supreme Court interpreted this language to require that the proposed expert testimony have a "valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert,* 509 U.S. at 591-92. Stated differently, the expert's proposed scientific testimony must "fit" the specific facts of the plaintiff's case, and the Court must determine whether the proffered expert testimony is sufficiently tied to the facts in issue that it will aid the jury. *Id.* at 591 (stating that the district court's "gatekeeping role" requires ensuring that the expert testimony "is relevant to the task at hand"). As this Court has held, "[t]he question here is whether the reasoning or methodology 'fits' the facts of the case and will thereby assist the

trier of fact to understand the evidence." *Burst v. Shell Oil Co*., 120 F. Supp. 3d 547, 551 (E.D. La. 2015)(Vance, J.).

Under FRE 104(a), the party proposing expert testimony carries the burden of establishing its admissibility by a preponderance of the evidence. FRE Art. 104, Committee Notes on Rules—2000 Amendment.   Courts interpreting *Daubert* have uniformly placed the burden of proving admissibility on the proponent of the evidence. *See, e.g., Jacked Up, LLC v. Sara Lee Corp*., 291 F. Supp. 3d 795, 801 (N.D. Tex. 2018) (citing *Daubert*, 509 U.S. at 592 n.10, 113 S.Ct. 2786; *Johnson v. Arkema, Inc.*, 685 F. 3d 452, 459 (5th Cir. 2012) ("The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence."); *see also Bryant v. 3M Co.*, 78 F. Supp. 3d 626, 630 (S.D. Miss. 2015) (citing *U.S. v. Griffith*, 118 F.3d 318, 322 (5th Cir. 1997) ("The proponent of expert testimony must establish the expert's qualifications by a preponderance of the evidence."). Accordingly, it is Plaintiff in this case who must satisfy the twin requirements of FRE 702 before any expert of his proposed experts, including Dr. Meyer, may testify on any issue related to whether there was any defect in the Crown RM6000 and/or its design, including whether any alternative design would have prevented or lessened the injuries sustained by Plaintiff.

## IV.   DR. MEYER IS NOT QUALIFIED BY EDUCATION OR EXPERIENCE TO RENDER OPINIONS ON THE DESIGN OF A FORKLIFT OR A STAND-UP RIDER LIFT TRUCK

### A.  Principles Governing Exclusion of an Expert for Lack of Qualifications

Pursuant to FRE 702, when determining whether to admit the testimony of an expert, the Court must first examine who the proposed expert is: does he/she fall within the traditionally known fields of learning and expertise such as architecture, engineering, or medicine, and does he/she possess the knowledge, skill, experience, training, or education so that he can be qualified as an

expert. *See* 3 J. Weinstein & M. Berger, *Weinstein's Evidence § 702[04]* 1988.  The Court must gauge "whether the 'witness's qualifying training or experience, and resultant specialized knowledge, are sufficiently related to the issues and evidence before the trier of fact that the witness's proposed testimony will help the trier of fact." *United States v. Wen Chyu Liu,* 716 F.3d 159, 167 (5th Cir.2013). "An expert's opinion must have a 'reliable basis in the knowledge and experience of his discipline.'" *Allen v. Pennsylvania Eng'g Corp.,* 102 F.3d 194, 196 (5th Cir. 1996) (citing *Daubert*, 509 U.S. at 592). The trial court may thus properly exclude the testimony of any witness as an expert where that person is unable to demonstrate sufficient training or experience in the field for which he has sought to qualify as an expert.

**B. Dr. Meyer Is Not Qualified by Education or Experience to Offer an Opinion on the Design of a Forklift or Stand-Up Rider Lift Truck**

After earning a Ph.D. in mechanical engineering in 1994, Dr. Meyer has spent the vast majority of his career working in the fields of accident investigation/reconstruction and failure analysis.[9]  He owns a private firm, Edison Engineering, which engages in forensic engineering investigations principally when retained by attorneys.[10]  He is the only engineer at this firm.[11] Importantly, however, Dr. Meyer has no formal education, training, academic research, professional involvement and/ or practical experience in any aspect of the *design* of standup rider forklifts or lift trucks. During his deposition he admitted:

- He has never designed a stand-up rider lift truck or a forklift.[12]

- He has never designed a component part for a stand-up rider lift truck or a forklift.[13]

- He does not hold any design patents for a stand-up rider lift truck or *any* product.[14]

---

[9] *See* Exhibit D, Dr. John Meyer *Curriculum Vitae*.
[10] *Id.*; *see also* Exhibit C at p. 46.
[11] Exhibit C at p. 29.
[12] *Id.* at p. 91.
[13] *Id.*
[14] *Id.* at p. 199.

- He has never worked for a forklift or stand-up rider lift truck manufacturer.[15]

- He has never performed any tests related to any forklift or stand-up rider lift truck.[16]

- He has never published any papers or articles related to forklift safety or design.[17]

- He has never been retained by a company to perform consulting work for a forklift.[18]

- He has never been retained by a forklift manufacturer to perform a risk assessment.[19]

- He has never offered consulting services to a stand-up rider lift truck manufacturer.[20]

- He has never developed training materials for stand-up rider lift trucks or forklifts.[21]

- He has never worked for a government agency with responsibility for setting standards for forklifts.[22]

- He has never been asked by a government agency to perform a design or safety evaluation of forklifts.[23]

- He has never served on any American National Standards Institute (ANSI) committee dealing with forklift safety or design.[24]

- He hasn't made any submissions to the ANSI B56.1 committee regarding safety of stand-up rider lift trucks.[25]

Although he professes to have experience in "machine design" when pressed as to whether has ever designed any part of any product that had gone to market, Dr. Meyer admitted that he had not:

Q: That wasn't my question.  My question was really simple.  Have you ever designed a machine?

A: **I said I have designed parts of machines, but I have not designed an entire machine.**

---

[15] *Id.* at p. 200.
[16] *Id.* at p. 202.
[17] *Id.* at pp. 198-99.
[18] *Id.* at p. 201.
[19] *Id.* at pp. 200-01.
[20] *Id.* at p. 201.
[21] *Id.*
[22] *Id.* at p. 202.
[23] *Id.*
[24] *Id.* at p. 203.
[25] Exhibit C at p. 203.

Q: Okay, what kinds of parts to any machine have you designed?

A: **Just different components; things that would be -- support different elements of testing equipment, different sorts of, umm, ahh -- just a variety of different devices.**

Q: Can you identify for me any single device, component part that you have designed?

A: **I -- A machine component part? I design things that are more one-off sort of things for particular processes or things related to other sorts of test equipment; so it's not something that I can convey to you as a specific design element.**

Q: Okay, so let me ask this question: Have you ever designed a component part for a product that has been brought to market?

A: **I've designed stuff related to manufacturing processes.**

* * *

Q: Okay, I didn't ask you about processes. I asked you have you ever designed a component part for a product that went to market?

A: **As part of the actual component itself, I don't believe so.[26]**

Notwithstanding his complete lack of any formal qualifications and practical experience in the field of forklift or stand-up rider lift truck design, or the design of any product that has actually been brought to market, Dr. Meyer proposes to testify in this case that *the design* of the Crown RM6000 was somehow defective. Federal Rule of Evidence 702 prohibits the admission of this purported "expert" testimony.

Federal courts in Louisiana have routinely refused to admit the testimony of well credentialed experts who propose to offer opinions in fields in which they did not possess the requisite qualifications. For example, in *Sittig v. Louisville Ladder Group LLC*, the court was required to decide whether a mechanical engineer and a biochemical engineer were qualified to

---

[26] *Id.* at pp. 192-193. (emphasis added).

testify in a products liability case about *ladder design* when neither had worked for any ladder manufacturer, served on any ANSI committees, published articles relating to ladder design, taught any courses on ladder design, or otherwise had any involvement with designing ladders, nor had they conducted any research or inquiries into the area of ladder warnings. 136 F. Supp. 2d 610 (W.D. La. 2001).  Notwithstanding "the impressive educational and professional backgrounds" of both proffered experts, the court concluded that their testimony should be excluded, holding that "Rule 702 nonetheless requires that the expert be qualified in the relevant field[,]" and noting that "a review of the [experts'] depositions shows a lack of qualifications in the field of ladder design." *Id.* at 616.  *See also Clark v. R.D. Werner Co., Inc.*, 2000 WL 666380 *4 (E.D. La. 2000) (Clement, J.) (expert metallurgist excluded where he had never designed nor overseen assembly of a ladder, had not routinely performed testing on ladders, had not served on committees creating standards for ladder manufacture, and had not performed metallurgical testing on the ladder in question); *Robinson v. Am. Multi-Cinema, Inc.*, 2021 WL 189485 (E.D. La. May 11, 2021) (Brown, J.) (holding that expert in architecture was not sufficiently qualified to offer human factors opinions).

There is no reason why this Court should reach any different conclusion than that reached in the *Clark, Sittig,* and *Robinson* cases. While undoubtedly a well-qualified mechanical engineer, Dr. Meyer does not have the qualifications necessary to provide expert testimony on the *design* of a stand-up rider lift truck.  He has never designed a forklift or any component part of a forklift or stand-up rider lift truck.  He does not hold any patents involving the design of any stand-up forklift.  He has never been retained by any company to perform a safety or risk analysis related to any forklift or stand-up rider lift truck.  He has never been asked by a government agency to perform a design or safety evaluation of a forklift.  He has never developed training materials for stand-up rider lift trucks or forklifts.  He has never published any articles on the design or safety of a stand-

up rider lift truck or submitted an article for peer review.  Nor has Dr. Meyer been involved in the development of regulations regarding the design or operation of stand-up lift trucks, including those published through ANSI.  For all of these reasons, his testimony related to any proposed alternative *design* of the RM6000 should be excluded at the outset under FRE 702.

## V.   DR. MEYER'S DESIGN OPINIONS SHOULD BE EXCLUDED BECAUSE THEY DO NOT MEET THE STANDARDS FOR RELEVANCE AND RELIABILITY REQUIRED BY FRE 702 AND *DAUBERT*.

Even if Dr. Meyer had the qualifications necessary to offer an "expert" design opinion in this case, that does not end the inquiry into his admissibility. As Rule 702 and *Daubert* make clear, the admission of expert testimony is proper only if the expert's scientific, technical, or other specialized knowledge will "help the trier of fact to understand the evidence or to determine a fact in issue" (i.e. *relevance*) and that it "is the product of reliable principles and methods." (i.e. *reliability*).  Because Dr. Meyer's proposed testimony fails to meet any of these criteria, it must be excluded.

### A.  Dr. Meyer's Door and Foot Pedal Design Opinions Are Inadmissible Because He Has Failed to Identify Specific Alternative Designs

Rule 702 provides that the expert testimony must "help the trier of fact."  Thus, the Court must determine whether the proffered expert testimony is *relevant*, i.e., is it sufficiently tied to the facts in issue that it will aid the jury. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993) (stating that the district court's "gatekeeping role" requires ensuring that the expert testimony "is relevant to the task at hand"). This Court has also previously identified the importance of determining "whether the reasoning or methodology 'fits' the facts of the case and will thereby assist the trier of fact to understand the evidence" in the context of determining the admissibility of expert testimony. See *Burst*, 120 F. Supp. 3d at 551.

To set forth a valid claim for defective design under the Louisiana Products Liability Act, La. R.S. 9:2800.51 *et. seq.*, it is essential that the claimant articulate an alternative design for the product that he claims was capable of preventing or reducing his injuries. La. R.S. 9:2800.56.  Here, although Dr. Meyer has proposed the addition of a door and a reprogramming of the foot pedals as his "alternative designs" for the RM6000, he has failed to provide a *specific* alternative designs for each of these proposals.[27]

As to the proposed addition of a door on the stand-up rider lift truck, Dr. Meyer has failed to offer any specifics as to the size of the proposed door, its composition, its thickness, its weight, its intrusion resistance, how it would be hinged, and/or whether it would be spring loaded or latched in some manner.[28]  Dr. Meyer confirmed that he had not submitted a specific alternative design for a door on the RM6000:

> Q: Have you proposed any specific alternative design for a door on the RM6000 Crown lift truck?
>
> **A: I have not submitted any specific design recommendation, no.[29]**

In fact, Dr. Meyer testified *multiple* times that he had not created a specific design for the proposed door on the RM6000.[30]  Dr. Meyer further admitted at his deposition that, while he *could have* offered a specific alternative design for a door, and that it would be easy to do, he simply did not do so here:

> A: I have conveyed to you multiple times that **I have not made a specific recommendation for a specific door** to be added by Crown. I think that a specific design **can be** certainly generated. Specific designs have been generated that fit on

---

[27] Dr. Meyer also purports to offer an alternative design for a backrest presence sensor, but Mr. Vallee testified that he kept his back on the backrest throughout the subject incident. *See* Deposition of Dawson Vallee, Exhibit E, p. 72. Accordingly, the existence (or non-existence) of a backrest sensor is irrelevant as it would not have prevented Plaintiff's injury. Moreover, Dr. Meyer also fails to provide a *specific* alternative design for this presence sensor and simply opines that one *should be* included without providing any specifications, drawings, or other specifics about how it would work or affect the operation of the RM6000. Exhibit C at p. 114.

[28] Exhibit C at pp. 86-87, 89-90, 92, 94.

[29] *Id.* at p. 86 (emphasis added).

[30] *Id.* at pp. 86, 89, 90, 92.

Crown forklifts, and certainly that isn't something that's difficult to do, the weight
of which can easily be calculated. I don't feel like I need to reinvent the wheel when
it comes to that.

Q: Okay, I appreciate that. So you haven't done this process that you say is pretty
easy to do, which is to put together a specific alternative design for a door on the
RM6000, correct?

A: **I have not.**[31]

As to the foot pedals, Dr. Meyer has simply proposed that they be "reprogrammed" so that

the left foot is now on the sensor pad and the right foot controls the brake.[32]  He offers no specifics

as to how that programming would be performed and the precise functioning of each pedal/pad

once that reprogramming took place.[33]  Again, he fails to provide a *specific* alternative design for

this concept:

Q: …Have you prepared any actual prototype in which you have reversed those
pedals in the manner that you have described?

A: **I do not have a prototype that I have done that with, no.**

Q: Have you prepared any documents in which you describe precisely how the
pedals should be reprogrammed under your alternative design?

A: **I have not specified precisely how those pedals are to be redesigned**. …[34]

In sum, as to both the proposals for the addition of a door and the reprogramming of the

pedals Dr. Meyer has done nothing more than thrown out potential *ideas* without detailing any of

the specifics as to how each would be accomplished in the RM6000.   Merely introducing

alternative design *concepts* without identifying any specifications, drawings, models, schematics,

or testing to demonstrate that the proposed designs are specifically applicable to the subject

product is insufficient to meet the requirements of an LPLA design defect claim. *See, e.g., Scordill*

---

[31] *Id.* at pp. 89-90 (emphasis added).
[32] *Id.* at p. 105.
[33] *Id.* at pp. 105-06.
[34] Exhibit C at pp. 105-06 (emphasis added).

*v. Louisville Ladder Grp., LLC*, 2003 WL 22427981, *9 (E.D. La. Oct. 24, 2003) (Vance, J.). (granting summary judgment where plaintiffs failed to "clearly identify a specific alternative design" for the subject product).

In sum, it is undisputed that Dr. Meyer has not proposed any specific alternative designs for the RM6000. Accordingly, his design opinions do nothing to "help the trier of fact" in determining whether the RM6000 was "unreasonably dangerous in design" pursuant to the LPLA. Dr. Meyer's opinions are thus inadmissible under the *relevance* prong of Rule 702 and *Daubert*.

### B. Dr. Meyer's Design Opinions are Inadmissible Because They Have Not Been Tested.

The first reliability factor identified by the Supreme Court in *Daubert* was whether the expert's theory "can be (and has been) tested." 509 U.S. at 593. As noted by the Court: "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry" 509 U.S. at 594. In *O'Connor v. Commonwealth Edison Co.*, 807 F.Supp. 1376 (C.D. Ill. 1992), *affd,* 13 F.3d 1090 (7th Cir. 1994), the court summarized the importance of this factor:

> In science, a proposition is not true just because one claiming to be an expert is willing to make such a statement. In law, a statement is not admissible just because a self-proclaimed expert is Willing to say it on the witness stand. **Scientific truths must be verifiable or they are not scientific truths at all.** An expert's opinion must also be verifiable or it is not **expert** at all. Rules of both science and evidence require a scientist or an expert **to have a verifiable scientific basis** for his opinions.

*Id*. at 1390 (emphasis added).

In the present case, Dr. Meyer *theorizes* that a door *could be* incorporated into the RM6000 (without identifying any specifics of that design) and that the foot pedals *could be* reprogrammed or reconfigured (again without identifying any specifics of that design). He then further *theorizes* that these design changes *could have* prevented Plaintiff's injury. However, because he has never

articulated any specific alternative designs for those concepts (see above), it is impossible for Dr. Meyer to ever test his theories. Thus, even if Dr. Meyer contends that the "addition of a door" and/or the "reprogramming of the pedals" are sufficient articulations of alternative designs, he has never even attempted to test any such designs. Dr. Meyer testified that he has access to laboratory space.[35] Dr. Meyer testified multiple times that he had not performed any tests related to his proposed alternative designs for a door or the reprogrammed foot pedals:

> Q: Have you conducted any testing on any proposed alternative design for a door on any lift truck?
>
> A: **No.**[36]
>
>          *      *      *
>
> Q: …Have you done any testing of the Yale Hyster design that you have referenced here at Page 125 of your expert report?
>
> A: **I have not done any testing of that design**.[37]
>
>          *      *      *
>
> Q: Have you done any testing of any proposed alternative design in which you have reversed the pedals in the manner you are proposing?
>
> A: … **No, I have not done any testing on this particular design.**[38]

Moreover, Dr. Meyer did not do any testing related to the impact of his proposed "alternative designs" on the utility of the forklift.[39] He didn't do any field testing of these design changes or observe forklift operators operating forklifts with these designs.[40] Dr. Meyer didn't perform any testing related to "emergency situations" or the ability of operators to stay on a forklift in the event they lift their foot

---

[35] Exhibit C at p. 28.
[36] *Id.* at p. 92 (emphasis added).
[37] Exhibit C at p. 96 (emphasis added). The "Yale Hyster" design is one which had foot pedals in a different configuration but he had never tested such a design. *Id.*
[38] *Id.* at p. 110 (emphasis added).
[39] *Id.* at p. 127.
[40] *Id.* at pp. 127-28.

off the floor.[41] Dr. Meyer didn't perform any testing related to acceleration or deceleration.[42] He performed no testing to determine whether the forces acting upon Mr. Vallee were enough to bring his foot out of the operating compartment.[43]  He hasn't performed testing related to operators keeping five points of contact inside the compartment of the RM6000.[44]  He also has not performed any testing related to operator fatigue and the impact a door has on operators.[45]  He further conceded that he has never been asked by any forklift manufacturer, public or private company, government agency, or any other entity to study an alternative design for any forklift, nor has he proposed to study potential injuries associated with the use of a forklift in order to consider potential alternative designs.[46]

In cases where the proposed testimony of an expert is based on the assertion that an alternative design could have prevented the injuries sustained, the most important factor in determining the reliability of the expert's theory is whether that hypothesis can and has been tested.  The failure of an expert to "test" an opinion or theory has been cited frequently as a crucial, if not decisive, factor in excluding the expert's testimony.  *See, e.g., Watkins v. Telsmith, Inc.,* 121 F.3d 984 (5th Cir. 1997) (testimony of expert in machine design was rejected where he did not test his proposed alternative design for gravel conveyor system so as to support his contention that the alternative design would have prevented accident); *Sittig v. Louisville Ladder Group* LLC, 136 F.Supp.2d 610, 619 (W.D. La. 2001) (testimony of mechanical engineer and biomechanical engineer both rejected because of a failure to perform any tests on the proposed alternative design); *see also Tassin v. Sears, Roebuck and Co.*, 946 F.Supp 1241 (M.D. La. 1996) (testimony from mechanical engineer was

---

[41] *Id.* at pp. 77-78.
[42] *Id.* at p. 146.
[43] *Id.* at p. 163.
[44] *Id.* at pp. 186-87.
[45] *Id.* at p. 215.
[46] Exhibit C at pp. 100, 201-03, 215.

excluded where he did not test his alternative design for a miter gauge clamp).   An expert witness's failure to validate a "hypothesis" with testing is detrimental to the admissibility of those opinions, as this failure necessarily renders those opinions unreliable. *See Sardis v. Overhead Door Corp.,* 10 F.4th 268, 295 (4th Cir. 2021) ("Just as in *Nease,* [plaintiff's expert] 'presented a hypothesis only,' but 'failed to validate it with testing' or any other objective comparison, which 'renders his opinions . . . unreliable.'") (citing *Nease v. Ford Motor Co.*, 848 F.3d 219, 232 (4th Cir. 2017)).[47]

Here, it is undisputed that Dr. Meyer has never tested any of his theories on the issue of an alternative design for the RM6000.  His opinions are thus inadmissible under the *reliability* prong of FRE 702 and *Daubert*.[48]

### C. Dr. Meyer's Design Opinions are Inadmissible Because They Have Not Been Subjected to Peer Review and Publication

Submission of a particular theory to the scrutiny of the scientific community is a component of "good science," because it increases the likelihood that substantive flaws in methodology will be detected. *Daubert*, 509 U.S. at 593-4.   "The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised." *Id.*

Here, it is undisputed that Dr. Meyer has never prepared or submitted any paper or article for peer review dealing with the safety or design of a forklift or stand-up rider lift truck at any

---

[47] *See also Cummins v. Lyle Inds.*, 93 F.3d 362 (8th Cir. 1996) (testimony of engineering expert was rejected where he had never tested his proposed alternative designs for an industrial trim press and had no practical knowledge on the application of his alternative design to the product).

[48] It is also important to note that because Dr. Meyer failed to conduct any testing of his design opinions, Crown is unable to assess the known or potential rate of error of the methodology used in forming his opinions, nor can it identify the existence and maintenance of standards and controls of the methodology—two other non-exhaustive factors identified by *Daubert*. 509 U.S. at 593-94 (1993).

time.[49] Moreover, Dr. Meyer hasn't published *anything*, even if it was not peer reviewed, which deals with the design or safety of stand-up forklifts.[50] He testified:

> Q: Have you ever published any peer-reviewed papers or articles on the design or safety aspects of a standing forklift?
>
> A: **Not on the standing forklift specifically.**
>
> Q: Have you ever submitted an article for peer review which dealt with the safety or design of a forklift of any description?
>
> A: **No, I have not.**
>
> Q: Have you published anything on the design or safety of standup forklifts, even if it was not peer reviewed?
>
> A: **No.**[51]

Dr. Meyer's opinions regarding the design of stand-up rider lift trucks have been publicized solely in the context of litigation in which he was retained by an attorney to further the cause of his/her particular case. Dr. Meyer only "publishes" his opinions on forklifts through his private consulting firm where there is no opportunity for other experts to critically assess his proposals. This litigation-driven, "in the shadows" approach is the antithesis of "good science" and for that additional reason, Dr. Meyer's opinions should be deemed inadmissible under the *reliability* prong of FRE 702 and *Daubert.*

### D.  Dr. Meyer's Door Design Opinion is not Generally Accepted Within the Relevant Scientific Community

 "In determining whether an expert's methodology is sufficiently reliable, *Daubert* asks, among other things, whether the expert's methodology can be controlled by standards, and whether the theory or methodology is generally accepted within the scientific community." *Atl. Specialty*

---

[49] Exhibit C at p. 198.
[50] *Id.* at p. 199.
[51] Exhibit C at pp. 198-199 (emphasis added).

*Ins. Co. v. Porter, Inc.,* No. CV 15-570, 2016 WL 6126062, at *5 (E.D. La. Oct. 20, 2016), *aff'd*, 742 F. App'x 850 (5th Cir. 2018) (citing *Daubert*, 509 U.S. at 594). In matters involving the forklift and lift truck industry, what is "generally accepted" is reflected in the publications of the American National Standard Institute (ANSI), which "oversees standards and conformity assessment activities in the United States."[52] According to its website, "ANSI's mission is to enhance both the global competitiveness of U.S. business and the U.S. quality of life by promoting and facilitating voluntary consensus standards and conformity assessment systems, and safeguarding their integrity."[53] ANSI has a subcommittee—referred to as the B56.1 Subcommittee—that sets forth a generally accepted safety standards for powered industrial trucks, including stand-up rider forklifts like the RM6000.[54]

Importantly, the applicable ANSI standard developed by the B56.1 Subcommittee on lift trucks requires an open operator compartment for standup rider forklift trucks. Specifically, it provides: "[S]tand-ups, rear-entry end control, narrow aisle, and reach trucks ***shall be designed with open operator compartments*** to permit easy ingress and egress.  This allows the operator, where possible, free and easy egress from the truck in the event of an imminent tip over or off-the-dock accident."[55] Moreover, on two separate occasions, 1987 and 1996, the B56.1 Subcommittee flatly rejected proposals to require that stand-up rider lift trucks be equipped with doors.[56]  The 1987 proposal received only one vote, from the proposing member, to change the regulation.[57]  In 1996, there was not even a second to the motion such that it was not even brought up for a vote.[58] The issue has not been raised since. Thus, the very design characteristic that Dr. Meyer purports

---

[52] http://www.ansi.org (last visited October 14, 2021).
[53] *Id.*
[54] https://blog.ansi.org/2020/12/ansi-b56-1-2020-itsdf-safety-standard-trucks/#gref (last visited October 14, 2021).
[55] *See* Exhibit F, B56.1 Safety Standard § 7.41 Operator Restraint Systems (2012 Revision) (emphasis added).
[56] *See* Exhibit G, ANSI B56.1 Meeting Minutes (1987); *see also* Exhibit H ANSI B56.1 Meeting Minutes, (1996).
[57] Exhibit G at CROWN_012301.
[58] Exhibit H at CROWN_012328-012330.

to offer as part of his proffered expert testimony has been considered ***and rejected*** by the relevant scientific community.

Here, because Dr. Meyer's design opinion on the addition of a door on the RM6000 is directly contrary to the ANSI standards on this very subject, they cannot be deemed "generally accepted" in the relevant technical community.[59]  In fact, not only are those opinions not generally accepted, but also, they have been ***specifically rejected*** by the ANSI B56.1 Subcommittee, the very entity responsible for developing standards for the design and safe operation of stand-up rider lift trucks.[60] This heavily weighs in favor of the exclusion of Dr. Meyer's design opinions on the basis that they are unreliable.

### E.  Dr. Meyer's Design Opinions are Litigation Driven and Developed Solely to Meet the Needs of the Attorneys Who Retain Him

Additionally, in assessing *reliability*, this Court has followed *Daubert II* in looking at "whether experts are 'proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.'"  *Burst*, 120 F. Supp. 3d at 551 (quoting *Daubert II*, 43 F.3d at 1317).  Dr. Meyer has testified that he has never been asked to perform any kind of analysis of forklift safety or design outside of the litigation context,[61] nor did any of his professional interests prior to becoming involved in this litigation involve the safety or design of stand-up rider forklifts.[62] The fact that Dr. Meyer has never formed the design opinions that he seeks to offer in this matter *outside of the context of litigation* indicates that they are purely results-driven and developed expressly for the purpose of testifying.

---

[59] Nor has Dr. Meyer submitted any evidence to suggest that his proposal for the reprogramming of the pedals is "generally accepted" in the relevant scientific community.
[60] https://blog.ansi.org/2020/12/ansi-b56-1-2020-itsdf-safety-standard-trucks/#gref (last visited October 14, 2021).
[61] Exhibit C at pp. 196-98.
[62] *Id.*

Dr. Meyer testified that the only times in his entire career he has ever worked on the safety elements of any forklift or stand-up rider lift truck were when retained by counsel:

> Q: Before you were contacted in 2019 [by Mr. Warshauer] to become a litigation expert, had you ever had any professional interest that included the analysis of the design for safety of a standing forklift?
>
> A: **I had done no investigations related to standup forklifts before.**
>
> Q: So, it wasn't until you were contacted by an attorney that you started doing any work on the design or safety of a standing forklift; is that correct?
>
> A: **That's correct.**[63]
>
> *       *       *
>
> Q: Other than work that you have done for a plaintiff attorney, have you done *any* work of *any* description in evaluating the safety or design of a standing forklift?
>
> A: **No.**[64]

Dr. Meyer, again, has made no submissions to ANSI,[65] the ANSI B56.1 Subcommittee,[66] or any government agency which regulates the safety and design of forklifts aside from a single letter to OSHA, drafted after he had begun working with plaintiff attorneys in forklift cases as a supposed "expert."[67]  Moreover, Dr. Meyer has not published any articles, reports, or papers on the safety and design of forklifts.[68] His opinions are only publicized through litigation, again demonstrating that Dr. Meyer's "expert" opinions are solely developed for attorneys who have a vested interest in the outcome of their cases.  This is simply not "good science", and Dr. Meyer's design opinions should be excluded under the *reliability* prong of FRE 702 and *Daubert*.

---

[63] Exhibit C at pp. 196-97 (emphasis added).
[64] *Id.* at p. 198 (emphasis added).
[65] *Id.* at p. 203.
[66] *Id.*
[67] *Id.* at pp. 203-05.
[68] *Id.* at pp. 198-99.

VI. **CONCLUSION**

For all the reasons stated above, this Court should exclude the expert opinions of Dr. John

Meyer under Federal Rule of Evidence 702 and *Daubert*.

**IRWIN FRITCHIE URQUHART & MOORE LLC**

BY:     */s/ Kelly E. Brilleaux*_____
        QUENTIN F. URQUHART, JR. (#14475)
        KELLY E. BRILLEAUX (#33030)
        400 Poydras Street, Suite 2700
        New Orleans, Louisiana 70130
        Telephone: (504) 310-2100
        Facsimile: (504) 310-2101
        Email: qurquhart@irwinllc.com
                kbrilleaux@irwinllc.com

**MCDONALD TOOLE WIGGINS, P.A.**

        MICHAEL CORRENTI (*pro hac vice*)
        PHILIP KEGLER (*pro hac vice*)
        111 N. Magnolia Ave, Suite 1200
        Orlando, Florida 32801
        Telephone: (407) 246-1800
        Facsimile: (407) 246-1895
        Email: mcorrenti@mtwlegal.com
                pkegler@mtwlegal.com

        *Counsel for Crown Equipment Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing pleading was filed electronically with the Clerk of Court using the Court's CM/ECF system and a copy sent to all counsel of record by electronic means on the 20th day of October, 2021.

        */s/ Kelly E. Brilleaux*