**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **DAWSON VALLEE** | * | **NO. 2:20-cv-01571** |
| | * | |
| **Plaintiff** | * | **JUDGE: SARAH S. VANCE** |
| | * | |
| **VERSUS** | * | **MAG.: KAREN WELLS ROBY** |
| | * | |
| **CROWN EQUIPMENT CORPORATION** | * | |
| **OF OHIO d/b/a CROWN LIFT TRUCKS,** | * | **SECTION: "R" (4)** |
| **GEORGE BORDELON, AND** | * | |
| **ADAM GIROIR** | * | |
| | * | |
| **Defendants** | * | |

*************************************************************************

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S, CROWN EQUIPMENT
CORPORATION, MOTION FOR SUMMARY JUDGMENT ON
<u>REASONABLY ANTICIPATED USE</u>**

MAY IT PLEASE THE COURT:

### I.  Introduction

The thrust of the defendant's, Crown Equipment Corporation, motion for summary judgment and memorandum in support request this Court make factual findings better left to the jury.  Crown claims judgment should be granted in its favor because plaintiff voluntarily and intentionally stuck his leg out of the open compartment and that plaintiff violated his training. Plaintiff respectfully suggests that these are material issues of fact precluding summary judgment in Crown's favor on the issue of reasonably anticipated use.

### II.  Pertinent Facts

Plaintiff, Dawson Vallee, was operating a Crown RM6000 while employed by Republic National Distributing Company and sustained a below the knee amputation.  Dawson began his shift at 6:00 p.m. the night before.  He initially worked on the bottle line from 6:00 p.m. to 9:00

1

p.m. putting bottles of liquor in cases.[1]  He took lunch and then from 10:00 p.m. to 3:00 a.m., Dawson worked on the case line.[2]  He then got onto the Crown forklift, designated C-21, and placed empty pallets in the back of the warehouse."[3]  As his shift was coming to an end, Dawson made his way to the blue box compactor.  He unloaded boxes off the forks of the lift, threw all the boxes in the compactor and proceeded to get back into the lift.  As he started heading forward with forks-trailing, "the lift started to lose mechanical function."[4] As Dawson stated, "the stick itself, wasn't responding."[5]  Dawson knew that to brake the forklift, he could either take his foot off the auto-brake or "you could just slow down to a slow speed using the multi-function handle."[6]

---

[1] Q:  So I went there, and there's an actual aisleway and what, you're walking through there and you're hand-picking individual --
 A:  Bottles and placing them in cases.
(Deposition of Dawson Vallee p. 51, line 1-4 attached as Exhibit "1").
[2] Q:  And then it looks like you took -- you must have had your lunch break from 9:00 p.m. to 10:00 p.m.?
 A:  Yes, sir.
 Q:  And then you say: "At 10 p.m. I went to the case line, working on cases placed on the line until about 3:00 a.m."
(Deposition of Dawson Vallee p. 51, lines 8-13 attached as Exhibit "1").
[3] A:  [e]mpty pallets that the product was on and we go place them in the back of the warehouse, and then they dispose of them or do whatever they do with them after that.
(Deposition of Dawson Vallee p. 52, lines 11-14 attached as Exhibit "1").
[4] A:  I realized that the lift started to lose mechanical function.
(Deposition of Dawson Vallee p. 63, lines 24-25 attached as Exhibit "1").
[5] A:  Like the stick itself, it wasn't responding.
(Deposition of Dawson Vallee p. 63, lines 25 to p. 63 line 1 attached as Exhibit "1".).
[6] A:  You could either take your foot off of the auto-brake, or you could just slow down to a slow speed using the multi-function handle, like you're saying.
(Deposition of Dawson Vallee p. 43, lines 23-25 attached as Exhibit "1").

When "plugging", or using the multi-function handle to stop the forklift, failed to work, Dawson glanced back at the failed control[7] and then went to Plan B.[8]  Dawson **took his foot off the brake** and "at that point it still didn't stop, and that's when it **jerked me** around the outside of the machine…"[9]  At that point, Dawson's leg got caught between the pole and the forklift itself, crushing his left leg.  The following photograph shows the final resting point of Dawson's crushed leg as it set against the forklift.  (Photograph attached as Exhibit "3"). There was no guard or door on the open compartment to protect his leg from being "jerked around the machine."

The distance from the blue box compactor to the point of impact is 20-25 feet.[10]  Dawson estimated that he started plugging after traveling five (5) feet[11] and then lifted his foot off the

---

[7]  Q:  And at any point did you ever look down at the controls?
   A:  I took a glance back at the -- What did you call it right there?
(Deposition of Dawson Vallee p. 68, l5-18 attached as Exhibit "1").
      **Crown Technician, George Bordelon, explained that even something as innocuous or a piece of dirt can get inside the multi-function handle and "make the joy stick not want to do anything."**  Bordelon explained that "the joy stick does most of the truck.  It controls travel.  It controls lift, the horn, everything goes on the one stick."
(Deposition of George Bordelon p. 15, lines 20 to p. 16 line 2 attached as Exhibit "2")(Emphasis supplied).
      For example, Bordelon explained that on November 18, 2018 Donald Raziano had an issue with forklift C-21 when the forks would not work.  The forks are controlled by the multi-function handle.  However, the Crown technician who called on Republic on November 18, 2018 found that the **joy stick was working when he arrived at Republic**.
(Deposition of George Bordelon p. 17, lines 1-5 attached as Exhibit "2")(Emphasis supplied). (See also Declaration of Donald Raziano dated 10/29/21 attached as Exhibit "12").
      Thus an intermittent, spontaneous failure of the lift truck's joy stick occurred prior to Dawson's accident.  The lift truck at issue on November 28, 2018 – C-21, the same lift truck operated by Dawson Valle on the date of his accident.
[8] A:  I took a look at it when it was unresponsive, and that's when I realized I had to go to plan-B, and take my foot off the auto brake.
(Deposition of Dawson Vallee p. 68, lines 20-22 attached as Exhibit "1").
[9] (Deposition of Dawson Vallee p. 64, lines 7-8 attached as Exhibit "1")(Emphasis supplied).
[10] A:  From where I took off to the accident itself, I would say it's 20 foot, 25 foot.
(Deposition of Dawson Vallee p. 64, lines 11-12 attached as Exhibit ""1).
[11] A: I mean, I give it 4 or 5 foot. Once I realized it was unresponsive, that's when I started to plug the machine itself.
(Deposition of Dawson Vallee p. 67, lines 6-8 attached as Exhibit "1").

brake when he was only ten (10) feet from the pole.[12]  Dawson estimated his speed at somewhere

between 3-6 mph.[13]  From the time he took off until the time of impact 2-3 seconds elapsed.[14]

Quinn Fassbender was an eyewitness to some of the events of this early morning tragedy.

Quinn signed a statement on May 6, 2019.  This statement is attached as Exhibit "4" and mimics

some of what Dawson says.  The pertinent part of that statement provides as follows:

> On May 3rd, I Quinn Fassbender saw Dawson get on his stand up
> lift and start pull away backwards.  He was looking the way he was
> driving the looked back at the controls as he started to turn the lift.
> Before he look backup, he lost control and tried to regain control
> but it was to late. Dawson ran into one of the poles by the bottle
> line.

It is important to note that Fassbender's written statement dated May 6, 2019 never

mentions that Dawson was "going fast."  Dawson specially denied that he was operating the lift

truck at too fast of a speed.[15]  In fact, Dawson specifically denies intentionally or voluntarily

placing his foot outside the lift truck prior to impact:

> Q:     **Did you make any attempt to try to step out of the lift
>          truck prior to impact?**
> A:     **No sir.**
> (Deposition of Dawson Vallee p. 72 lines 20-22 attached as
> Exhibit "1")(Emphasis supplied).

Dawson further described plugging not working and lifting his foot off the brake… "and

that's when **the lift tossed my leg outside of the machine**, and it caught it in between the

machine and the pipe itself."[16]  As indicated in the above photograph, Dawson marked the area

---

[12] A:  [s]o I would say probably 10 foot from the point of impact.
(Deposition of Dawson Vallee p. 69, lines 1-2 attached as Exhibit "1").
[13] A:  I couldn't be going no faster than 3 to 6 miles an hour.
(Deposition of Dawson Vallee p. 66, lines 19 attached as Exhibit "1").
[14] A:  [a]nywhere from two to three seconds from the time I took off to the collision itself -- to the impact.
(Deposition of Dawson Vallee p. 80, lines 1-2 attached as Exhibit "1").
[15] Q:  Do you believe that you were operating the lift truck at a speed that was too fast?
  A:  No, sir.
(Deposition of Dawson Vallee p. 81, lines 16-18 attached as Exhibit "1").
[16] Deposition of Dawson Vallee p. 65, lines 1-5 attached as Exhibit "1".

where his foot was located between the pole and the "skirt" of the lift truck post-accident, stating "…when it jerked me on the outside, that's when **my leg got kicked out to the outside**."[17] While the defendant's point to a comment by Dawson about not having a specific memory of how his foot got outside the machine, Dr. John Jeka, an expert in the field of human balance, explains that when one picks up his or her foot and is made to balance on one foot, like the counterintuitive instruction to lift a foot **off** the brake to stop the Crown RM6000, the leg has an involuntary response to regain balance, i.e. an autonomous response of nerves and fibers in the foot to the spine involuntarily compel the widening of your stance to regain balance or the lifting your left leg when weight is transferred onto your right leg in an effort to maintain balance.[18] Thus, a reflexive action caused Dawson's left leg to leave the confines of the open compartment. To be sure, Dawson Vallee did not intentionally place his foot outside of the compartment so that it could be crushed.

Not only does Crown reasonably anticipate impacts between rigid objects and the forklift, Crown has actual knowledge that there will be impacts between its forklifts and stationary objects. The RM600 is designed to operate in narrow aisles. The subject forklift C-21 has multiple paint transfers, nicks and gashes commonly seen from various impacts with stationary objects.[19] Dr. Richard Ziernicki examined the subject forklift and stated as follows:

> The forklift, like any other forklift in use, has multiple evidence of impacts with rigid objects, not one, not two, but multiple. That is totally typical what I have seen over 20 – something years. That's evidence of impact with rigid objects. Not necessarily rigid object. Some of them are rigid objects. Some of them can be tides on the

---

[17] Deposition of Dawson Vallee p. 73, line 13 attached as Exhibit "1".
[18] See Dr. John Jeka's report attached as Exhibit "6"
      And
   A: Essentially, you're trying to increase your base of support due to the fact that you are feeling unstable. You feel like your balance has been compromised, and so you naturally widen your stance in order to become more biomechanically stable.
(Deposition of Dr. John Jeka, p. 59, lines 5-10 attached as Exhibit "7").
[19] See attached photographs of the subject forklift attached as Exhibit "8" *in globo*.

floor.  What it is, there are impacts.  There was multiple
discoloration, red, blue, and I think yellow colors.  I was very
much interested in that.
(Deposition of Dr. Ziernicki p. 52, line 24 to p. 53, line 10 attached
as Exhibit "5").

Ronald Grisez is the director of product safety for Crown and has been in that position

since 2007.  He has testified in twenty-five (25) Crown stand-up lift cases where the operator

suffered a lower leg injury.[20]  Mr. Grisez acknowledges that the number of lower leg injuries to

operators of Crown stand-up lift trucks from 1977 to 2017 total "just less than 700".[21]  Mr.

Grisez explained that additional injuries have occurred since 2017 but Crown is "kind of

revamping the whole accident report/summary process" … "we're behind in reading the new

accident reports and getting them into the summary."[22]

For a "use" standpoint, Mr. Grisez confirmed that "designers ought to understand the

design intent, the use, the task of the operator, evaluate the hazards and mitigate those hazards to

a reasonable level."[23]  Further, "…part of the risk assessment is to understand, you know, all that

and come up with a way to reasonably reduce those risks to an acceptable level."[24]  More

importantly, Grisez opined that "part of the risk assessment [is] **to understand**, you know, **how

the truck can be used and misused**."[25]  In fact, in regard to foreseeable misuse of the forklift,

Mr. Grisez stated:

> Q:   Impact with fixed objects are more common than tip overs
>       and off-docks combined, true?
> A:    Definitely.  You know, these are mobile trucks in fixed
>       environments.  We see that they come in contact with
>       pallets, rack up rights.  We definitely see that in the field so
>       that's a true statement.

---

[20] *Anthony Johns v. Crown Equipment Corporation, et al*, Supreme Court of the State of New York, County of
Broome, Case #EFCA2019002015, Deposition of Ronald Grisez p. 5, line 21 to p. 6 line 1 attached as Exhibit "9".
[21] *Id.* at 8, lines 11-17 attached as Exhibit "9".
[22] *Id* at 9, lines 3-4 and 19-29 attached as Exhibit "9".
[23] *Id* at 13, lines 11-15 attached as Exhibit "9".
[24] *Id* at 14, lines 9-11 attached as Exhibit "9".
[25] *Id* at 15, lines 14-17 attached as Exhibit "9" (Emphasis supplied).

> Q:    And virtually all lift trucks have incidental collision with
>        fixed objects?
> A:    That's kind of what I was describing with the witness
>        marks. **That incidental contact is pretty common in the
>        industry**, and the operator compartment protects the
>        operators in those situations.
> **Q:    But any incidental contact between a lift truck and a
>        fixed object has the potential to cause serious injury to
>        the operator, true?**
> **A:    I think if the extremity is outside the operator
>        compartment, that would be a true statement.**
> (Deposition of Ronald Grisez, *Johns v. Crown*, p. 146, lines 1-22
> attached as Exhibit "11")(Emphasis supplied).

Notwithstanding nearly 700 severe left leg injuries, including multiple amputations,

Crown **always** takes the position that when an accident occurs to an operator who finds his or her

leg outside the open operator compartment, it is always a volitional act on the part of the

operator.

> Q:    And if the operator suffers a lower leg injury because his or
>        her leg was outside of the operator compartment, is it
>        Crown's position that that is the operator's error?
> A:    We believe that there was nothing with the operation of the
>        truck that would have put their foot or lower extremity
>        outside of the operator compartment, so if it was outside of
>        the operator compartment, **we believe it was a volitional
>        act that put it there.**[26]

Dr. John Meyer commented on risk assessment and its relationship to the anticipated use

of a stand-up forklift in detail in his report. Because of Mr. Grisez's admission of the importance

of risk, use, foreseeable misuse and their specific application to Crown's motion, plaintiff offers

the following excerpt from Dr. Meyer's report:

> The design safety hierarchy provides structure to the elimination or
> reduction of risk posed by hazards. Many different manifestations
> of this hierarchy have existed since the mid 20th century. Barnett
> and Brickman examined 39 different variations dating as far back
> as 1953. The rationale behind the usage of a hazard control

---

[26] Deposition of Ronald Grisez, *Johns v. Crown*, p 67, line 24 to p. 68 to line 10 attached as Exhibit "9". (Emphasis supplied).

hierarchy is to attempt to address hazards in the most effective manner first. For example, see the Hierarchy of Controls shown in Figure 26 below which shows the hierarchy divided into five broad categories of risk reduction measures. Measures higher in the hierarchy are preferred over those lower due to their increased effectiveness at eliminating risk. **ANSI B11.0 provides a more detailed Hazard Control Hierarchy (Figure 27) in a more tabular format with examples and explanations on how the protective measure may impact risk.**
(Emphasis supplied)



Figure 26: Hierarchy of Controls. Measures higher in the hierarchy are preferred over those lower due to their increased effectiveness at eliminating risk.

**Table 3 — The Hazard Control Hierarchy**

| | Protective Measure | Examples | Influence on Risk Factors | Classification |
|---|---|---|---|---|
| **Most Preferred** ↓ **Least Preferred** | Elimination or Substitution | • Eliminate pinch points (increase clearance) <br> • Intrinsically safe (energy containment) <br> • Automated material handling (robots, conveyors, etc.) <br> • Redesign the process to eliminate or reduce human interaction <br> • Reduced energy <br> • Substitute less hazardous chemicals | • Impact on overall risk (elimination) by affecting severity and probability of harm <br> • May affect severity of harm, frequency of exposure to the hazard under consideration, and/or the possibility of avoiding or limiting harm depending on which method of substitution is applied. | Design Out |
| | Guards and Safeguarding Devices | • Barriers <br> • Interlocks <br> • Presence sensing devices (light curtains, safety mats, area scanners, etc.) <br> • Two hand control and two-hand trip devices | • Greatest impact on the probability of harm (Occurrence of hazardous events under certain circumstance) <br> • Minimal if any impact on severity of harm | Engineering Controls |
| | Awareness Devices | • Lights, beacons, and strobes <br> • Computer warnings <br> • Signs and labels <br> • Beepers, horns, and sirens | • Potential impact on the probability of harm (avoidance) <br> • No impact on severity of harm | |
| | Training and Procedures | • Safe work procedures <br> • Safety equipment inspections <br> • Training <br> • Lockout / Tagout / Tryout | • Potential impact on the probability of harm (avoidance and/or exposure) <br> • No impact on severity of harm | Administrative Controls |
| | Personal Protective Equipment (PPE) | • Safety glasses and face shields <br> • Ear plugs <br> • Gloves <br> • Protective footwear <br> • Respirators | • Potential impact on the probability of harm (avoidance) <br> • No impact on severity of harm | |

Figure 27: The Hazard Control Hierarchy from ANSI B11.0-2010

As stated previously, the hierarchy generally divides the risk treatment strategies into three broad categories. The higher in the hierarchy, the more preferred the risk reduction strategy is due to its effectiveness at affecting risk. The first is designing out the hazard either through elimination or substitution. It is preferable to design the hazard out of the system altogether. A hazard that has been eliminated no longer poses a risk of harm. Hazards that are avoided, eliminated or substituted through design will not change unless the design feature is changed. Relevant here, including a door and changing the brake pedal design are design changes.

**The next category is generally referred to as engineering controls. These consist of guards and safeguarding devices such as barriers, interlocks, and presence sensing devices. When a hazard cannot be eliminated by designing it out of the machine or system, engineering controls can be used to reduce risk by isolating the people from the hazard, taking into account the intended use and reasonably foreseeable misuse. A door and pedal design can also be considered engineering controls.**

**The last and least preferred category of addressing risks is administrative controls. Administrative controls, reliant on human behavior and subject to human fallibility, include**

**warnings, training and safe work procedures, and personal protective equipment**. They are the least effective form of risk reduction as they have no impact on the severity of harm associated with a hazard and only provide for the potential of reducing probability of harm. ANSI's ergonomic guidelines for design describe why administrative controls are usually less desirable:

*In the risk reduction hierarchy, worker training is usually less preferred than alternative solutions such as designing out the hazard associated with product use or guarding against potential hazard exposure. In general, error can be reduced by proper training, but it is important to recognize that training is not a substitute for good design practice. Workers may not comply with their training due to such issues as memory lapses or reversion to previously learned procedures.*
(Dr. Meyer's report pp. 61-64 attached as Exhibit "10")(Emphasis supplied).

Clearly, the use of the product and known and foreseeable risk are all interconnected, but one thing remains certain -- you cannot properly and reasonably make an assessment of those connections if a conclusion is pre-determined.[27] Further, every time, no matter the circumstance, that an occupant's leg get injured outside of the compartment, it is pre-ordained he or she has violated his training.[28]

## II.  Law and Argument

### A.    Summary Judgement Standard

A defendant is not entitled to summary judgment on a plaintiff's claims unless the defendant can demonstrate that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a).  A defendant must support its assertion of undisputed material facts by citing to the case record or showing that the plaintiff cannot produce admissible evidence to support a material fact

---

[27] See *fn 29*, *supra*
[28] See also Deposition of Ronald Grisez, *Johns v. Crown*, p. 69, lines 13-22, confirming that every time an operator gets his foot outside of the open compartment of the stand-up lift truck, the operator is "responsible for putting it there." (Exhibit "9") and p. Deposition of Ronald Grisez, *Johns v. Crown*, 72 line 7 to p. 73 line 8 attached as Exhibit "9".

at issue. Fed. R. Civ. Proc. 56(c).  The substantive law applicable to the case identifies the material facts for purposes of the summary judgment motion.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  When assessing whether a genuine dispute of material facts exists, the court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008) (citing *Reeves v. Sanderson Plumbing Prod., Inc*., 530 U.S. 133, 150 (2000)).  The court "must draw all reasonable inferences in favor of the nonmoving party," and it ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party."  *Reeves*, 530 U.S. at 150; *Delta & Pine Land Co*., 530 F.3d at 399.  The trial court should act with caution in granting summary judgment and may deny the motion in a case in which "there is reason to believe that the better course would be to proceed to a full trial."  *Anderson*, 477 U.S. at 255 (citing *Kennedy v. Silas Mason Co*., 334 U.S. 249 (1948)).

It is evident that in every case where an operator's leg gets outside of the open compartment, Crown seeks a per se rule of law that (1) the operator placed his leg **intentionally** and/or volitionally outside of the compartment and (2) **violated his training**.  In the instant case, Crown urges that LPLA actually suggests such a draconian application of the "reasonably anticipated use" notwithstanding the fact and circumstances of this particular case.

*Marable v. Empire Truck Sales of La., LLC*, 221 So.3d 880 (La. App. 4th Cir 2017) is one of the more recent cases that provides guidance in what constitutes "reasonably anticipated use of the product" under the LPLA.  In that case, Mrs. Marable sustained severe and permanent injuries when an idling truck somehow slipped into gear and ran over her while she was chasing it in an attempt to turn off the ignition.  The curator of Mrs. Marable filed a suit against Daimler

Trucks North America, the manufacturer of the tractor, and the owner of the tractor, Wayne

Marable, who was also plaintiff's husband.

This accident happened in Lowe's parking lot in New Orleans East where Mr. Marable

had parked his tractor overnight.  Mr. Marable got into his cab, checked the parking brake to

ensure it was engaged, placed his transmission in neutral and then started the engine.  He then

got out of the cab while it was idling in neutral and began his pre-trip inspection.  As he went to

open the passenger door, Mr. Marable heard a loud "pop or bang" and the tractor began to move

with no one in the cab.  Mr. Marable yelled to his wife/plaintiff to open the driver's door and

turn off the ignition.  The ignition was located on the left side of the steering column and could

be accessed from the ground.  Mrs. Marable followed her husband's instructions, but while

running after the moving tractor, she tripped and fell underneath the tractor and was dragged for

some distance, sustaining an anoxic brain injury.

The Fourth Circuit cited the LPLA requirement that a claimant must prove that damages

arose from a "reasonably anticipated use" which is defined as "a use or handling of a product

that product's manufacturer should reasonably expect of an ordinary person in the same or

similar circumstances." *Id*. at 893.  The court noted that "under the LPLA a manufacturer is

liable only for those uses it should reasonably expect of an ordinary consumer." *Id.* at 894.

But what followed was not a specific examination of just the plaintiff's conduct; rather

the court examined all the facts and circumstances of the entire event that lead up to the

plaintiff's injury.  The court reviewed the various expert testimony, the DTNA's driver's manual,

the usual and customary conduct of the co-defendant Wayne Marable and his interaction with the

tractor.  The court held:

> **Based on this evidence presented to the jury**, we cannot say that
> its determination that the accident and Mrs. Marable's damages

arose out of a "reasonably anticipated use" of the tractor was
manifestly erroneous or clearly wrong.
(Emphasis supplied).

The point that the Fourth Circuit was making is that there is no hard and fast per se rule

of law that allows the defendant to defeat an action by merely reclassifying the plaintiff's or co-

defendant's conduct such that every "use" that produces an injury is not anticipated.  Further,

material facts regarding the reasonably anticipated use is a mixed question of fact and law.

In this case, not only does Crown expect that there will be collision with bollards, pipes,

poles or whatever moniker one wishes to attach to an object, but the entire industry is aware of

this type of "use" or "handling" of the product will happen.  Crown knows use or handling of

stand-up forklifts with an open compartment like the RM6000, have resulted in nearly 700

severe left leg injuries including below the knee amputation.  Further, Mr. Grisez acknowledged

product use **and misuse** should guide design decisions.  Dr. John Meyer also agrees with Mr.

Grisez that foreseeable misuse should guide design decision.  The following comments by Dr.

Meyer are important in addressing "reasonably anticipated use."

### A. Design criteria — reasonably foreseeable misuse

**A central tenet of engineering design today is that machine
designs need to be informed not just by the intended use of the
product or machine, but also by reasonably foreseeable misuse**.
Here, there are two basic kinds of actions that are misuse.
Intentional conduct such as seeing if a forklift can do a "wheelie"
is one kind of misuse. Certainly, some of that kind of action needs
to be considered, but there are certainly going to be bizarre misuses
that do not need to be considered for a product to still be properly
designed. The relevant engineering standards specifically exclude
consideration of deliberate misuse in design. In general, another
kind of misuse is inadvertent conduct like applying the brakes too
late, oversteering, or losing control. This kind of human or driver
error is called misuse by designers. It is foreseeable, and it must be
considered in the evaluation of the design. This is because, as
humans, we're incapable of perfection and engineering design
needs to reflect this fact, particularly when it pertains to the

safety-related aspects of a machine. **This is reflected in the Code of Ethics for Engineers which in the first of six fundamental canons indicates that engineers must, "Hold paramount the safety,health, and welfare of the public." Despite this fact, stand-up forklift manufacturers and the experts they have hired cling to the notion that it is sufficient to instruct and train an operator tobehave properly at all times, then blame them for any error they may commit. That kind of position is virtually universally rejected in the mechanical engineering and design community.** After it was released as an ANSI Technical Report in 2000, ANSI B11.TR3 Risk assessment and risk reduction – A guide to estimate, evaluate and reduce risks associated with machines tools was hailed as, "The greatest stride forward in the field of safety in the past 25 years."125 ANSI B11.TR3 called for machines to be designed in a manner that takes into account not only the intended use of a machine, that is, use that is in compliance with the supplier's instructions, but also accommodates reasonably foreseeable misuse. Since then, it has become the norm in engineering consensus standards and expected in modern design. Both ANSI B11.0 and ANSI/ISO 12100, previously discussed, require it. The international forklift standard ISO 3691 states that,

*Industrial trucks need to be designed to prevent foreseeable misuse wherever possible, if such would engender risk.*

It later indicates that the standard deals with all relevant significant hazards, hazardous situations or hazards events "when used as intended and under conditions of misuse which are reasonably foreseeable by the manufacturer," and it also includes ANSI/ISO 12100 as a normative reference which mandates the same.

ANSI B11.TR3 defines reasonably foreseeable misuse and provides direction in terms of how it should be considered. Reasonably foreseeable misuse is defined as:

*The predictable use of a machine in a way not intended by the supplier or user, but which might result from human behavior.*

**Accommodating deliberate misuse of a machine is not reasonable and is not required by these standards. Having said that, there is no evidence of deliberate misuse in this case.** In applying these concepts to stand-up forklift design, one can envision multiple instances of how imperfect operator behavior might be illustrated. For example, manufacturers of stand-up forklifts cannot assume that an operator is going to perfectly

14

adhere to instructions and training. One way this could manifest itself is the forklift operator not maintaining five points of contact at all times and lack of vigilance in maintaining proper operating position. Not being in the proper operating position could have ramifications in terms of maintaining balance during forklift operation. Without a door as a barrier to exiting the operator compartment, loss of balance could lead to the left leg or even the entire body exiting the operator's compartment. When about to lose their balance or fall, people instinctively reach for and grab the nearest thing. As Dr. Jeka points out, they also can be expected to automatically move their feet to maintain the best base of support. A leg leaving the operator compartment could be crushed in a collision between a fixed object and the forklift. The operator's entire body leaving the operator compartment potentially results in a foot, leg or other body part being run over by the forklift.

Many operators don't expect the forklift to be as dangerous as it is. As explicitly stated in ANSI/ISO 12100, the capacity of operators to appreciate the risks in such a situation must be taken into account. Although the assumption of "safe" should not be made, the fact that it is tends to preclude users from thinking about safety, thus reducing the likelihood that they will anticipate possible hazards and make the necessary check or take the appropriate action. As a result, products should be designed so that they cannot be used improperly. If that is impractical or impossible, guards or other means can be used to cause the operator to think about the hazards. The last option is to warn when neither other option is practical. This trilogy of design options is often interchangeably called the Hazard Control Hierarchy, the Design Safety Hierarchy, or the Hierarchy of Controls. As discussed below, when possible, eliminating or greatly reducing a hazard by the use of a better design is always preferred.

Other scenarios must also be considered by forklift manufacturers. Particularly in operators without extensive experience, loss of control can occur. This could be considered incorrect behavior, inappropriate actions or reactions, or forgetting information—all specific items noted by ANSI B11.0 and ANSI B11.TR3 to be included in the risk analysis. With loss of control, the likelihood of loss of balance increases as does the likelihood of a foot, leg, or entire body exiting the envelope of the occupant compartment. (Dr. Meyer's report pp. 51-54 attached as Exhibit "10")(Emphasis supplied.)

Clearly, the above comments and references to applicable ANSI standards and general engineering principles by Dr. Meyer are informative on the issue of reasonably anticipated use in that some inadvertent, unexpected conduct simply cannot be "warned" or "trained" away.

This machine was manufactured especially for Republic on June 17, 2016.[29]  Dawson Vallee was a certified forklift operator.  He was sufficiently trained in the operations of the Crown RM6000.  Dawson was thrust into an emergency situation when the multi-function joy stick failed and within mere seconds his left leg was "tossed", or "kicked" or "jerked" outside of the machine – something that had happened for too frequently during the "use" or "handling" of stand-up forklifts with open compartments.

As the deposition testimony and attached exhibits reveal, Crown was well aware that there would be inadvertent, unintentional contact between its forklift and various stationary objects, some contact causing no damage and some causing severe crush and/or amputation to the operator's left leg.

Further, and with all due respect to the Fifth Circuit, the *Kampen* decision incorporating plaintiff's negligent conduct into the reasonably anticipated use inquiry may, at times, lead to placing the defendant's knowledge and conduct on the back burner for another day.

Arguably, the Louisiana Fourth Circuit's decision in *Marable* pushes back on *Kampen* as it implicitly allowed the jury to decide reasonably anticipated use as a mixed question of law and fact.  Moreover, the *Marable* decision comports with Louisiana's comparative fault system by allowing the jury to decide whether the use or handling was reasonably anticipated.

---

[29] Q:  Your report, on page 28, says that it was built June 17th, 2016
  A:  Okay.
(Deposition of Ronald Grisez p. 33, line 15-17, *Vallee v. Crown*, attached as Exhibit "11")

Also, placing Crown's, knowledge and conduct on the back burner in the instant case can have significant ramifications for operators of the Crown stand-up forklifts.  Crush and amputation injuries to the left leg are happening at an alarming rate – 15 per year.[30]  Moreover, the following bullet points are further evidence that Dawon's use was a reasonably anticipated use of Crown's product:

- Crown knows that off-dock accidents cannot happen at the Republic National Distributing Company facility.[31]

- Crown knows that tip-over accidents have reduced, if not been close to eliminated, because Crown's re-engineering of the stand-up forklift to address that safety issue.[32]

- Crown knows that, other than a bruised elbow in an accident in 1995, there has not been a single injury or death to an operator using a Crown stand-up forklift that had a door.[33]

- Crown knows it has a responsibility to protect users of its products from foreseeable injuries by performing a risk assessment "to understand… and come up with a way to reasonably reduce those risk to an acceptable level."[34]

- Crown knows it has an obligation to protect users from foreseeable misuse in that "part of the risk assessment [is] to understand, you know, how the truck can be used and misused."[35]

- Crown knows that its forklift and their occupants will have impact with stationary objects especially in a narrow aisle warehouse environment, some causing injuries and some not.

The *Kampen* decision, relied on by Crown contains language that clearly suggests the use of the RM6000 by Dawson Vallee was a "use or "handling" reasonably anticipated by Crown:

> [T]he plaintiff's use of the product will not be a reasonably anticipated use unless…"the plaintiffs had presented evidence that dispute the warnings, [the manufacturers], should have been aware

---

[30] (Deposition of Ronald Grisez, *Johns v. Crown*, p. 142, lines 21-25 attached as Exhibit "9").
[31] See Declaration of Donald Raziano attached as Exhibit "12".
[32] (Deposition of Ronald Grisez, *Johns v. Crown* pp. 89-90 attached as Exhibit "9").
And
(Deposition of Dr. John Meyer p. 146, lines 3-20 attached as Exhibit "13").
[33] (Deposition of Ronald Grisez, *Johns v. Crown* p 12, line 11 to p. 13, line 5 attached as Exhibit "9").
[34] (Deposition of Ronald Grisez , *Johns v. Crown* p 13, line 24 to p. 14, line 11 attached as Exhibit "9").
[35] (Deposition of Ronald Grisez, *Johns v. Crown*, p 15, lines 9-17 attached as Exhibit "9")

that operators were using the [product] in contravention of certain
warnings."
(Citing *Lock Art v. Kobe Steel Ltd.*, 989 F.2d 84 (La. 5th Cir. 1993).

The above *Kampen* language is harmonious with the opinion of expert witness Dr. John

Meyer, P.E. who testified in pertinent part:

> "I think this case is a good demonstration of the fact that in an
> emergency sort of situation administrative controls, such as
> warnings are completely ineffective…rather than relying on
> warnings to keep somebody's leg inside the operator compartment
> of the forklift, they could add a door, which would positively
> restrain it from leaving the operator compartment.
> (Deposition of Dr. John Meyer p. 173, lines 2-13 attached as
> Exhibit ""10).

**Warnings on the RM6000 Lift Trucks are Inadequate**

The first few pages of the memorandum submitted by Crown are cut and paste warnings

or instructions from the Operation Manual.

Dawson testified that he did not review the Crown Operation Manual as part of his

certification and training process.[36]  He viewed a video, took a test, and got certified as a stand-

up lift operator.[37]  Thereafter, he also had some discussions with the older guys who had been

employed at Republic National Distributing Company regarding the use of the forklift.[38]

The warnings placed on the lift are randomly affixed to the RM6000 with no specific

warning that the use of the RM6000 could lead to an amputation.  The warnings are so disjointed

and haphazard in their placement that Dawson did not look at them.  Republic National

Distributing Company dayshift manager, Donald Raziano, confirmed the scattershot inadequate

warning of a known risk of use of the RM6000.

> Q:      When you get into the compartment of C-21, is there any

---

[36] (Deposition of Dawson Vallee, p. 37, line 10 attached as Exhibit "1").
[37] (Deposition of Dawson Vallee p. 32, lines 7-12 attached as Exhibit '1').
[38] (Deposition of Dawson Vallee p. 53, line 8-12 attached as Exhibit "1").

> warning within your visual field about any type of risks
> associated with the use of the truck?
> A:    I believe there is a warning sign to keep your hands free,
>       where you can injure your hands or your fingers because of
>       it being a reach equipment.
> Q:    Where would that be - - as I'm facing the joy stick, where
>       would it be?  Would it be to my right or to my left or within
>       my visual field where I would look?
> A:    I believe it's to my left.
> Q:    To your left.
> A:    When I'm facing the joy stick.
> Q:    Do you recall if there's any specific warnings on that
>       particular truck - - actually any of the reach trucks,
>       warnings about the specific risks of amputation.
> A:    No, not to my knowledge.

(Deposition of Donald Raziano p. 32, lines 4-19 attached as Exhibit "15").

It is hornbook law that the adequacy of warnings, including their display and placement, are questions of facts for the jury.[39]

## **Conclusion**

In every case where an operator's left foot leaves the open compartment by it either being "thrown out" or "propelled", as described by Mr. Vallee, Crown has already reached a conclusion that the operator has intentionally or voluntarily placed his leg outside of the compartment without any investigation of the facts and circumstances of the particular case.  In fact, the second after the impact event occurs, Crown has a prepackaged defense:

> All we know is that his leg was outside, we don't know the way,
> but again, the operator would have been responsible for putting it
> outside the operator compartment.[40]

---

[39] Whether a particular warning or instruction is adequate is a question for the trier of fact, when determining the adequacy of "warnings, the trial of fact considers the severity of the danger, the likelihood of successful communication of the warning to foreseeable consumers, the intensity and form of the warning, and the cost of improving the strength or mode of the warning. (*Thibodeaux v. Wellman*, 190 F. Supp 566, 575-76 (E.D. LA 2016)).

[40] Deposition of Ronald Grisez, *Johns v. Crown,* p. 75, line 25 to p. 76, line 3 attached as Exhibit "9".

Piggybacked onto this pre-ordained defense is the inter-connected argument that the operator violated his training.[41]

Mr. Grisez of Crown and Dr. Meyer agree that understanding "use and misuse" of the stand-up forklift is essential when analyzing risk of harm associated with the reasonably anticipated uses of the forklifts.[42]  Crown knows that there will be foreseeable, emergency events during the use of its product.  Although unexpected events, such as tip over and off-dock accidents are rare, Crown knows that the number one emergency event producing injury is impact to stationary objects causing left leg injury.[43]  It is certainly an event that Crown reasonably anticipates in the use of their lift trucks.  Plaintiff's criticism is with that actual knowledge of such an event producing on average fifteen (15) severe left leg injuries per year, why hasn't Crown fixed the problem?  The "fix" to this problem will be discussed in plaintiff's memorandum in opposition to motion for summary on defective design which is incorporated herein by reference.

Plaintiff respectfully requests that the Court reject this cookie-cutter defense, allow the jury to hear all the evidence from the lay and expert witnesses, and dismiss Crown's summary judgment on "reasonably anticipated use."

---

[41] See *fn* 28 *supra*.
(Deposition of Ronald Grisez, *Johns v. Crown,* p. 73, lines 4-8 attached as  Exhibit "9").
[42] In connection with Mr. Grisez's acknowledgment of the importance to assess known use and misuse of products, Dr. Ziernicki looks to a basic textbook used in the mechanical engineering field, The Mechanical Design Process, and quotes the book at p. 64:

> There are three ways to institute product safety.  The first way is to design safety into the product.  This means that the device poses no inherent danger during normal operation or in case of failure.  If inherent safety is impossible, as it is with most rotating machinery and vehicles, then the second way to design in safety is to add protective devices to the product.  The third form of designing for safety is the use of a warning to point out dangers inherent in the use of the product.

Arguably Crown has chosen the third and most least effective mechanical process, a warning, in its contemplation of known use and misuse of its product.  And to make matter worse, this warning has a known failure rate. According to a graph prepared by Dr. Ziernicki, it is **not** "nearly 700" operators of stand-up forklifts that heave sustained left lower leg injuries; rather the number totals **908**. (See Dr. Ziernicki's report pp. 27-29 attached as Exhibit "14").
[43] (Deposition of Grisez, *Johns v. Crown*, p. 143, lines 2-5 attached as Exhibit"9").

Respectfully submitted,

/s/Patrick G. Kehoe, Jr.
Patrick G. Kehoe, Jr. #14419
3524 Canal Street
New Orleans, LA 70119
(504) 588-1110
(504) 588-1954 Fax


WARSHAUER LAW GROUP, P.C.
Michael J. Warshauer GA Bar #018720
Admitted Pro Hac Vice
2740 Bert Adams Road
Atlanta, GA 30339
(404) 892-4900
(404) 892-1020 Fax
Counsel for Plaintiff Dawson Vallee

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading was filed electronically with the Clerk of the Court using the Court's CM/ECF system and a copy sent to all counsel of record by electronic means this _____ day of November 2021.

/s/Patrick G. Kehoe, Jr.
PATRICK G. KEHOE, JR.