UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DAWSON VALLEE | * | NO. 2:20-cv-01571 |
| | * | |
| Plaintiff | * | JUDGE: SARAH S. VANCE |
| | * | |
| VERSUS | * | MAG.: KAREN WELLS ROBY |
| | * | |
| CROWN EQUIPMENT CORPORATION | * | |
| OF OHIO d/b/a CROWN LIFT TRUCKS, | * | SECTION: "R" (4) |
| GEORGE BORDELON, AND | * | |
| ADAM GIROIR | * | |
| | * | |
| Defendants | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT
CROWN EQUIPMENT CORPORATION'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFF'S DESIGN DEFECT CLAIMS**

**MAY IT PLEASE THE COURT:**

### I. Introduction

Crown has a long and confusing history regarding its open compartment design. This design defect causes crush or amputation injuries to the left leg of the operators of the stand-up forklifts when an operator of the forklift has an emergency or unexpected event such as an impact between the forklift and a stationary object.

Even more perplexing is that prior to Dawson Vallee's accident, or any similar accident involving a Crown stand-up forklift, Crown has already reached conclusions. In other words, without investigating the accident or performing any test, interviews or engaging any other determinative tool, Crown's conclusion is exactly what is contained in other motions for summary judgment filed in numerous left leg injury cases. Spearheading this pre-determined, non-scientific, *ipse dixit* defense is Ronald Grisez, director of product safety for Crown:

> Q:  Mr. Grisez, I want to come back to this idea about an
> operator gets his leg -- his or her leg outside of an occupant

compartment and suffers a lower leg injury and your use of the word volitional. **Is it Crown's position that every time an operator gets his or her leg outside of the occupant compartment of a stand-up lift truck and gets injured, that operator made a conscious decision to place his or her leg outside of the occupant compartment?**

A:       **I'm saying I don't know exactly the reason why it was outside, but they were responsible for putting it there**.[1]

And just like Crown's summary judgment in this instant case, the circular, interconnected, pre-ordained arguments continue:

Q:       And if the operator places his or her leg outside of the operator compartment -- occupant compartment, that would be contrary to the training provided by Crown, true?

A:       The training provided by Crown instructs the operator to stay within the running lines of the truck and inside the operator compartment. That's correct.

Q:       So is it Crown's position that every time an operator suffers a lower leg injury when no intrusion is involved, that the operator violated his or her training?

A:       Given that the instructions to the operator are to stay within the running lines of the truck while the truck is still moving -- those are the instructions, and if they do not do that or did not do that, then that would be a violation of the instructions.

Q:       **So every time an occupant's leg gets injured outside of the occupant compartment, the operator violated his or her training, true?**

A:       **There's -- that is the training. That's correct**.[2]

Thus, even for similar accidents that happened in 2021 or will happen in 2022, Crown's position is, in a nutshell, (1) you violate the Crown's warnings by putting your foot out and, (2) by putting your foot out you also violate your training.

---

[1] Deposition of Ronald A. Grisez, *Johns v. Crown Equipment Corporation, et al*, Supreme Court of the State of New York, County of Broome, Civil Division Case No. EFCA2019002015, (hereinafter "*Johns v. Crown*"), p. 69, lines 8-22 attached as Exhibit "1". (Emphasis supplied).
See also, Deposition of Ronald A. Grisez, *Johns v. Crown*, p. 75, line 25 to p. 76 line 3 attached as Exhibit "1".
[2] Deposition of Ronald A. Grisez, *Johns v. Crown*, p. 72, line 7 to p. 73 line 8 attached as Exhibit "1". (Emphasis supplied).

As mentioned in other filings, Dawson Vallee vehemently denies that he intentionally, voluntarily, volitionally, or purposefully stuck his foot outside of the open compartment of the RM6000 and sought to crush his foot between the pole/bollard and the RM6000.[3]  Further, it is undisputed that there is nothing in Mr. Vallee's pre or post-accident medical records to suggest he was somehow intentionally seeking to hurt himself.[4]  Yet, this is exactly what Crown argues in its memorandum.

As previously stated, Crown knows that there will be numerous collisions and contact between the stand-up forklift and stationary objects, some resulting in injury and some not.  For example, in *McEuin v. Crown Equipment Corporation*, 328 F.3d 1028 (9th Cir. 2003), plaintiff was injured while operating a Crown stand-up forklift, in a forks-trailing position, when he collided with a steel post.  McEuin had, "diverted his attention in order to check on the position of the cargo, extending his left leg outside of the operator's cabin as he leaned toward the front of the forklift." *Id.*

Crown argued, *inter alia*, that McEuin violated the warning by placing his foot outside of the door of the compartment and that the "ANSI [B.56] committee had twice rejected a recommendation that doors become a requirement on stand-up forklifts." *Id.*

McEuin argued that Crown was liable for "designing, manufacturing and selling the 30RC in an unreasonable dangerous condition because…it failed to supply a door that would have reduced or eliminated the risk of injury to the operator's left leg…" *Id.*  McEuin also argued Crown's warnings were inadequate.

---

[3] Q: Did you make any attempt to try to step out of the lift truck prior to impact?
  A: No, sir.
(Deposition of Dawson Vallee, p. 72, lines 20-22 attached as Exhibit "2").
[4] Mr. Vallee had graduated from Archbishop Shaw High School in May of 2018.  This accident occurred one year later.

The jury found that Crown's warnings were adequate, but "found that the design of the 30RC was dangerously defective." *Id.* Fault was apportioned 50-50 amongst Crown and plaintiff.

McEuin is one of the **nearly 700** lower leg injures suffered by operators of Crown stand-up forklifts through the year 2017.[5] Lower left leg injuries to Crown forklift operators are occurring at a rate of about 15 per year.[6]

As stated in Crown's memorandum in support of its motion for summary judgment, Crown believes that an open compartment is necessary so that operators, in emergency, unexpected off-dock or tip over accidents, can jump out of the compartment.

> Q:    So if an operator experiences an off-the-dock incident, it's
>        Crown's expectation that it will be the very first time this
>        operator has encountered such a situation, true?
> A:    Besides the instructions to jump, the actual encounter, yes.
>        These are very rare events.
> (Deposition of Ronald A. Grisez, *Johns v. Crown*, p. 118, lines 18-
> 25 attached as Exhibit "1".

In connection with the instant case, an off-dock accident is not only rare, it is impossible for such an event to happen at the Republic National Distributing Company (hereinafter "Republic") facility. The RM6000, C-21, was specifically manufactured for Republic for use at the facility where it was delivered (See Deposition of Ronald Grisez, *Vallee v. Dawson*, p. 28, lines 9-18 attached as Exhibit "3"). The request for admission answered by Crown leaves no doubt that the C-21 was manufactured specifically for Republic:

---

[5] Q:  What's the current number of lower leg injuries suffered by operators of Crown stand-up lift
      trucks?
  A:  I guess I haven't that number memorized except -- up to the year 2017. I believe in that -- from
      the beginning to 2017, I believe that number is just less than 700, I believe.
(Deposition of Ronald A. Grisez, *Johns v. Crown*, p. 8, lines 10-17 attached as Exhibit "1").
[6] Q:  And left foot injuries occur at the rate of about 15 per year. Is that still true?
  A:  The -- it's -- I think we talked about this before. It's around that average, yeah.
(Deposition of Ronald A. Grisez, *Johns v. Crown*, p. 142, line 21 to p. 143, line 1 attached as Exhibit "1").

**Request No. 4:** Crown manufactured the subject forklift specially in response to a purchase order.

**<u>Response:</u>** Crown admits that it manufactured the subject RM6000 based upon the specifications requested by Republic.

**Request No. 5:** Crown manufactured the subject forklift specifically in response to a purchase order from Republic National Distributing Company or an entity acting on its behalf.

**<u>Response:</u>** Crown admits that it manufactured the subject RM6000 based upon the specifications requested by Republic. (See Crown's responses to plaintiff's request for admission attached as Exhibit "4").

While the testimony of Mr. Grisez suggests off-dock accidents are rare, off-dock accidents involving the RM6000 model built specifically for Republic cannot happen. Stated in mathematical terms, there is a zero probability that off-dock accidents can happen at Republic with the RM6000 model. Mr. Donald Ranziano's declaration and photographs attached thereto show that the RM6000 could not access one area of the Republic where docks are located as conveyor belts were placed at the docks to load product into trucks. Further, the other dock area cannot accommodate the size of the RM6000 mast, i.e., driving the RM6000 into a truck at that door location would damage the building and the mast of the RM6000.[7]

Likewise, tip-overs are even rarer than off-dock accidents. Mr. Grisez confirms that Crown engineering seems to have significantly reduced, if not nearly eliminated, tip-over accidents. Failsafe mechanisms, such as slowing the stand-up forklift when the forks are up and loaded and reducing speed when the forklift turns at a specific angle prevents tip-overs, have contributed to this reduction in tip overs.[8] Not only that, but such a reduction in speed would

---

[7] See Declaration of Donald Raziano dated 10/29/21 attached as Exhibit "5").

[8] A: …Now we can detect if you're steering more than 10 degrees from straight ahead. We can start to slow the truck down.
(Deposition of Ronald A. Grisez, *Johns v. Crown*, p. 90, lines 19-21 attached as Exhibit "1").

significantly slow the timing of a tip-over event, confirming that a door would not impede exit during these extremely rare events.

## II.  Law and Argument

### A.  Summary Judgement Standard

A defendant is not entitled to summary judgment on a plaintiff's claims unless the defendant can demonstrate that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a). A defendant must support its assertion of undisputed material facts by citing to the case record or showing that the plaintiff cannot produce admissible evidence to support a material fact at issue. Fed. R. Civ. Proc. 56(c). The substantive law applicable to the case identifies the material facts for purposes of the summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When assessing whether a genuine dispute of material facts exists, the court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008) (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000)). The court "must draw all reasonable inferences in favor of the nonmoving party," and it ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Reeves*, 530 U.S. at 150; *Delta & Pine Land Co*., 530 F.3d at 399. The trial court should act with caution in granting summary judgment and may deny the motion in a case in which "there is reason to believe that the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 255 (citing *Kennedy v. Silas Mason Co*., 334 U.S. 249 (1948)).

### B.  The LPLA

A product is unreasonably dangerous in design if, at the time of the product left its manufacturer's control:

> (1)     There existed an alternative design that was capable of preventing the claimant's damage; and
>
> (2)     The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting the alternative design and the adverse effect, if any of such alternative design on the utility of the product.   An adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide adequate warnings to users and handlers of the product.
> LSA–R.S. 9:2800.56.
>
> (*Holloway v. Midland Risk Ins. Co.*, 832 So.2d 1004, 1011 (La. App. 2nd Cir. 2002)).

Under Louisiana law, the sources of law are legislation and custom. (La. C.C. art 1).  Legislation is a solemn expression of legislative will. (La. C.C. art. 2) Thus, under our Louisiana civilian tradition, a reading of the statute and application of the facts thereto, might lead one to conclude that the stand-up forklift operated by Dawson Valle was defective in design.

First, the inquiry must be whether there existed an alternative design for the product that was capable of preventing the claimant's damages, provided the alternative design existed at the time the RM6000 forklift left the manufacturer.  There is no requirement under the text of provision that there be a "specific" alternative design.  Neither the word "specific" nor the word "actual" appear in the pertinent part of LPLA under discussion.  The RM6000 stand-up forklift, C-21, was manufactured on June 17, 2016.[9]

At the time of the manufacturer of the RM6000 C-21, there existed an alternative design that would have prevented the claimant's damage.  Plaintiff submits that a door would have prevented the plaintiff's damage and, specifically, a door such as the one Crown manufactured for its RC model.  The declaration of Dr. Richard Ziernicki states the following:

---

[9]  A:  [Y]our report, on page 28, says that it was built June 17th, 2016.
(Deposition of Ronald Grisez, *Vallee v. Crown*, p. 33, lines 15-16 attached as Exhibit "3").

> A Special Order Door Summary was performed by Crown on 12/26/96, which determined that Crown had produced 347 lift trucks equipped with a door.  Crown has sold 176 doors to Ford after the 1996 survey was performed.  Moreover, according to the list of stand up rider with heated cabs, an additional 163 Crown stand up lift trucks were equipped with a door.  Through, 1/22/04, the total number of stand up lift trucks that Crown has provided with a door is 686.[10]

It is clear that Crown placed 686 Crown stand-up lifts into the stream of commerce with doors.  The December 12/26/96 door summary show the application of doors to RR and RC models with Ford, Chrysler and K-Mart having the majority of RR and RC stand-up forklifts with doors in their inventory.[11]

It is undisputed that there was not a single incident where a door contributed to the cause of any injury or death.[12]  In other words, Crown has not had a single crush to the left leg or left leg amputation when an alternative design, a stand-up forklift with a door, is in place.  Therefore, plaintiff has satisfied the second prong of the LPLA under a textual analysis.

The third prong of the analysis looks at the likelihood of the design would cause damage and the gravity to the damage.  The likelihood that the design would cause damage is significant in that there are approximately fifteen (15) serious left leg injuries, including crush and amputations, occurring per year.  The gravity of the harm, the loss of the lower extremity, is substantial.  These injuries are permanent in nature, create disability and warrant expensive medical treatment and care.[13]  Plaintiff has satisfied the third prong of the textual analysis.

---

[10] *Mahon, et al v. Crown Equipment Corporation, et al*, Case No. CIV-S03-1763 MCE DAD Doc. 75, p. 4, See also Special Order Door Summary attached as Exhibit "6").
[11] See deposition of Adam Giroir p. 14, lines 9-14 indicating that the RC and RM model compartment entrances are basically the same.  (Exhibit "7").
[12] Deposition of Ronald Grisez, *Johns v. Crown*, p. 12, line 11 to p. 13, line 5 attached as Exhibit "1".
[13] See medical cost summary of Dr. Shelly Savant attached as Exhibit "8".

The fourth prong of a civilian textual analysis must address the burden on the manufacturer in adopting the alternative and the effect of the alternative design on the utility of the product.

The burden on the manufacturer is slight.  To retrofit the RM6000 C-21 with a door the cost is $750-$1000[14]  Further, Crown could simply add to the cost of the product if it so chooses.  The point is that costs to add a door are extremely low.[15]  Moreover, the utility of the vehicle is not affected.  Crown has placed 686 Crown forklifts with doors into the market performing the task of carrying products from point A to point B.  A door does not affect the capability of the machine to lift, carry and deliver a product within the Republic warehouse.[16]

Having satisfied the four prongs, the adequacy of the warnings and the effect on the likelihood of Dawson's damage is the next inquiry.  There have been a substantial number of serious left leg injuries documented by Crown up to 2017.  Arguably, this presents an issue of fact – because of the substantiated number of injuries, are the warnings "adequate"?  Crown may argue that the warnings tell you to keep your legs inside the operator compartment, but it appears nearly 700 individuals have found there legs **outside** of the **open compartment**, with many sustaining an amputation.

---

[14] A:  It would be a ballpark.  It would probably be, because of the serviced and travel and the amount of work to retrofit versus just put a door on, probably in the 750-$1000 range.
(Deposition of Ronald Grisez, *Johns v. Crown* p. 162, lines 20-24 attached as Exhibit "1").

[15] There is no evidence that a door is prohibitively expensive such that they are a nonviable solution. Raymond and other manufacturers have been offering doors for years. Doors with and without latches have been successfully installed on and used on many stand-up lift trucks. Cost has never been claimed to be the reason it is not provided as standard equipment.
    In his testimony in the *Cagle v. Crown* case in 1990, Mr. Dan Dunlap at Crown indicated the cost of providing a rear safety door was $50.00 to $100.00 when installed at the factory. In 2000, Crown in an Interrogatory response in the *Crowe v. Crown* matter, stated that it would cost only $150.00 to install a door as original equipment and that it would add on another $350.00 for profit bringing the total cost to $500.00.
(Dr. John Meyer's report pp 112-113 attached as Exhibit "9").

[16] See Declaration of Donald Raziano dated 10/29/21 attached as Exhibit "5".

9

Arguably, the adequacy of the warning and whether the warning even works in unexpected, emergency situations is a question to be decided by the jury.  Perhaps Crown should consider a warning displaying an amputated leg within the operators view in the compartment to adequately warn of this known potential risk given the number of left leg injuries and amputations it is aware of.

### (ii.) Design Defect Jurisprudence Analysis

Louisiana case law suggests when the defect in question involves an easy and quick alternative, the plaintiff is not required to reinvent the wheel.

In *Holloway v. Midland Risk Ins. Co.*, 832 So. 2d 1004 (La. App. 2002), the plaintiff was a fireman involved in extricating a driver involved in a one-car accident.  During the rescue process, it was necessary to use hydraulic rescue equipment which included a "high-pressure hydraulic hose connecting the pump to the rescue tool." *Id*. at 1007.  At some point during the extraction, plaintiff "placed his right hand on the high-pressure hydraulic hose, which suddenly ruptured and blasted hydraulic fluid through his glove into the palm of his right hand" injuring plaintiff.  *Id*. at 1008.

The parties presented two opposing theories.  Plaintiff urged that the structural integrity of the hose would breakdown over time due to repetitive bending and flexing at the area "where the hose's rigid fitting or coupling connects to the hand-held rescue tool."  *Id*. at 1012. Plaintiff's expert suggested that a bend restrictor would have delayed breakdown of the integrity of the hose and concluded that "the design defect of failing to incorporate a bend restrictor on the hose caused or contributed to Holloway's injury." *Id*.

The hydraulic hose manufacturer, Holmatro, presented expert opinion that argued this was a "one-time failure" *Id.* event and that the rupture "probably occurred when [plaintiff's co-

worker] was using the hydraulic cutter in an attempt to remove the vehicle's brake pedal." *Id.*
The defense expert "opined that the cutter's contact with the metal of the brake pedal caused the
tool to 'bounce out' and placed an excessive load on the hose". *Id.*

The trial court allowed the competing opinions to go to the jury which rendered judgment
for plaintiff.  The court of appeal affirmed holding that "a jury could reasonably have found that
the use of the bend restrictor throughout the entire period of the hose's service more probable
than not would have prevented Holloway's injury by preserving the integrity of the hose through
its normal life expectancy." *Id.* at 1013.  Moreover, in connection with the risk-utility analysis,
the court stated, "the gravity of the potential damage resulting from a rupture of a high-pressure
hydraulic hose significantly outweighed the relatively minimal burden on Holmatro of adopting
the alternative design incorporating bend restrictors." *Id.*  The bend restrictor was a low-cost
addition to the hose that added to the structural integrity.  More importantly, nowhere in the
opinion does that Court suggest that plaintiff had to cast and produce its own bend restrictor.

Like the manufacturer in the *Holloway* case, *supra*, the defendant Crown has a low-cost
solution to address left leg amputations – a door.  The cost to retrofit the machine is minimal,
$750 - $1000, when compared to the gravity and risk of harm to the plaintiff – a risk that Crown
is all too familiar with.

In short, the gravity of the potential for injury to plaintiff's left leg from a frequently
occurring, known foreseeable event, an impact of a machine with a bollard or pole, injuring left
lower extremities, significantly outweighs the relatively minimal burden on Crown of adopting
the alternative design incorporating a door.  And too, Crown knows that the most common injury
sustained during the ordinary, foreseeable use of its machine is lower left leg injuries.[17]

---

[17] Q:  You agree that left foot injuries are the most common body part to be injured on a stand-up
forklift?

It is patently clear that an alternative design existed even before the date of the manufacture of the subject forklift.  There is substantial evidence that use of a door on Crown forklifts prevent left leg injury – when Crown manufactured and sold forklifts with doors not a single operator suffered an injury to their left extremity.[18]  When the proposed alternative design has been produced and put into practical use in the industry, then that alone is sufficient evidence of a specific alternative design.

In *Sandifer v. Hoyt Archery Inc.,* 2015 WL 4429189 (D.C. M.D. La July 20, 2015)  Dr. Sandifer was killed when a component part, specifically a metal cable guard, of a Hoyt Compound Bow penetrated his left temple and became imbedded in his brain.  The specific facts of the incident were unknown as the event was unwitnessed.

Like Crown in this case, defendant argued that plaintiff's expert should be stricken, because he failed to provide a specific alternative design that was designed, built or tested by plaintiff's expert.

In rejecting the argument that the plaintiff must always design, build and/or test the alternative design, Judge Dick looked to *Watkins v. Telsmith*, 1214 F.3d 984 (5th Cir. 1997) for guidance and stated "[c]ourts should critically examine alternative ideas offered by experts to insure they go beyond mere conceptualization and demonstrate feasibility." *Id* at *4.

Judge Dick found that the proposed alternative design went beyond conceptualization and demonstrated feasibility.  Arguably, the most salient fact leading Judge Dick to her conclusion

---

A:  I believe that's also correct.
(Deposition of Ronald A. Grisez, *Johns v. Crown*, p. 143, lines 2-5 attached as Exhibit "1").
[18] Q: Is it still true that Crown has no knowledge of a single incident where a door of a stand-up forklift contributed to cause any injury or death?
   A:  I don't know about no injury, but I'm aware that there are no serious injuries with a Crown truck that had a door.
(Deposition of Ronald A. Grisez, *Johns v. Crown*, p. 12, lines 11-17 attached as Exhibit "1").

was that the proposed alternative design – positioning the cable rod guide lower on the bow –

**"ha[d] already been produced by the defendant."** *Id.* **Further, the same alternative design**

**had been introduced into commerce by a competitor of the defendant manufacturer.**

This stand-up forklift at issue was manufactured on June 17, 2016.  Plaintiff's proposed

alternative design is the Crown forklift with a Crown door that is not only feasible, but has a

perfect record on the prevention of left lower crush/amputation injuries.

Moreover, Dr. Meyer's report reveals other competitors of Crown have introduced stand-

up forklifts with doors into the marketplace prior to plaintiff's injury.[19]  Implicit in Crown's

filing is that a Court should require the plaintiff to design a door and ignore Crown's door design

which, again, has a perfect safety record addressing those injuries Crown most commonly sees in

the use of its stand-up forklifts. There is no requirement the plaintiff and expert actually design,

produce and test their proposed design on the product at issue.  (*Guy v. Crown Equipment Co.*,

394 F.3d 320, 327 (5th Cir. 2004)).

Dr. Meyer's report and affidavit support the notion that the alternative design to C-21 is a

commonsense approach, which consists of adding hinges and a door:

> 8.  As I indicated in my report (p. 109-111), the addition of a door
> offer three primary functional benefits pertaining to lower left leg
> injuries.  It serves as visual and tactile reminder of the boundaries
> of the operator compartment and a reminder for the operator to
> keep their leg inside.  It also serves as a physical barrier to prevent
> the foot from leaving the occupant compartment. While doors can
> vary in the material from which they are constructed and how they
> are made to be kept shut, they possess several pertinent design
> elements all of which are shown in the doors referenced in my
> report.  The doors are hinged on either the right or left side of the
> operator compartment opening (when viewed from the rear).
> Either side is acceptable.  If hinged on the left side, an operator's
> left foot and leg will meet with higher resistance to the doors
> opening if the door is unlatched.  All doors cover the opening to
> the occupant compartment to a height approximately as tall as the

---

[19] See Dr. Meyer's report pp. 11-13 attached as Exhibit "9".

sides of the forklift main body.  A spring returns the door to the normally-closed position.  Other door elements are not critical to the functionality of the door in terms of the door in terms of operator left lower leg protection.

9.  A representative specific door design that I endorse is modeled after the door used by Railsback et al. in their 2014 study published in the Proceedings of the ASME 2014 International Mechanical Engineering Congress and Exposition (IMECE2014-38847).  The door is an aluminum off-the-shelf unit commercially available through Raymond.  Railsback et al. adapted it to a Crown sidestance stand-up forklift by welding the door hinges to the frame of the forklift.  The same adaptation can be performed on a Crown RM6000 such as the one utilized by Mr. Vallee. Railsback reports the specifics of the door: 28lbs, approximately 34 in tall 24 in wide and 0.35 in thick. The hinges are spring loaded and adjustable regarding the force required to open the doors. Images of this door in the open and closed configuration are show below.



(Dr. Meyer's affidavit #8-9 attached as Exhibit "10").

Thus, plaintiff has offered a specific alternative design notwithstanding the argument by Crown that they have not.

## **Second Design Alternative**

**In regards to the second design alternative, plaintiff offers switching the left foot brake to the right side of the floorboard which is presently occupied by the right foot pad**

**sensor.  The right foot pad sensor would then be placed where the left foot brake is presently**.[20]

Dr. Meyer's assertion, that the floorboard can be essentially reprogramed, via quick and easy fix, is similar to the *Johnson v. T.L. James & Co.*, 809 So. 2d 287 (La App. 1st Cir 2001) case.  In that case, Caterpillar manufactured an excavator that crushed plaintiff while it was backing up.  The back-up alarm system had become disconnected.  Because the machine was old, had been repaired a number of times and a guard removed, Caterpillar urged that "plaintiff cannot prove the unreasonably dangerous condition (of the excavator) existed when it left Caterpillar. *Id*. at 290-291.  The trial court agreed and granted summary judgment in the manufacturer's favor.

Although the appellate court concluded that summary judgment was inappropriate because issues of material fact existed, i.e. whether the defect existed at the time of the manufacture, the Court went further in its analysis under the LPLA and addressed the issue of whether plaintiff presented an alternative design that would have prevented damage.  In doing this, the *Johnson* court favorably weighed the testimony of plaintiff's expert who opined " a more substantial connector would have prevented plaintiff's damage noting plaintiff's expert opinion that "a more substantial…i.e. locking type or clip or keepers, and stated these types of alternative designs would 'prevent…the connector from being pulled apart'.'" *Id.* at 292.

Also, the *Johnson* court also performed a risk utility analysis, citing a U.S. Fifth Circuit court case, *Laverpere v. Niagra Machine & Tool Works, Inc.*, 910 F.2d 167, 184 (5th Cir. 1990) cert. denied 510 U.S. 859 (1993) which noted that the risk utility analysis maybe such that "the judge or jury, by relying on background knowledge and 'common sense' can ' fill in the gaps' in

---

[20] See paragraph 10 of Dr. Meyer's affidavit and pp. 124-125 attached at Exhibit "10" and his supplemental report dated 7/2/21, attached as Exhibit "9"

plaintiff's case, estimating the extent of the risk avoided, the costs of implanting the proposal design change or the adverse effects on the design modifications on the utility of the machine." However, "the product itself or the design feature in question must be relatively uncomplicated, and the implications of the change in design must be such that a layman could readily grasp them."[21]

In addressing this final issue as to whether summary judgment was appropriate the court stated:

> "Plaintiff produced evidence that a more substantial connector was used elsewhere on the 225B excavator.  'Filling the gaps as to the rest of the risk-utility analysis with our 'background knowledge' of this uncomplicated design feature, we can estimate the cost of implementing the alternative design is low in light of the risk of the alarm becoming disconnected, and without warning, the 225B excavator backing into an unaware victim.[22]

The analysis and the reversal of the trial court in summary judgment suggests that common sense, low cost alternative design should be presented to the jury without necessity of plaintiff spending exorbitant amounts of money to recreate "a wheel that is already created."

The *Johnson* case is important because there is no burden placed on the plaintiff or its expert to mold, test, configure or create a locking type connecter, clip or keeper which was more substantial and would have kept the wiring from disconnecting thereby alerting plaintiff that the excavator was backing up.  A door is an uncomplicated design alternative and most certainly transposing the left brake and right sensor is another easy and quick alternative design allowing the left leg to be placed firmly on the floor of the machine, rather than lifted to stop the lift truck.

---

[21] *Johnson v. T.L. James,* 809 So.2d at p. 292.
[22] *Id*.

## Third Alternative Design

**The third alternative design offered by Dr. Meyer is a backrest presence sensory switch.**  Dr. Meyer's discussion of the back presence sensory switch is found at p. 5 paragraph 11 of his affidavit and is another alternative design that is a nominal cost and enhances stability of the occupant of the stand-up forklift.  Testing of the switch has already been performed by Raymond, a competitor of Crown, and was discussed on p. 126 of Dr. Meyer's report.[23]  Crown knows what a sensing presence switch is because Crown has one on its entry bar.  The right "floor pedal" is a presence sensing switch.  Refrigerators, microwaves and ovens have a switch that senses when the door is open to turn on the light.  Enhancing stability in the confines of the open compartment  by "forcing" the operator to place his back against one of Crown's 5-points of stability, reduces the opportunity for plaintiff's left leg to leave the confines of the compartment.

## Risk Utility of the Alternative Design -- Generally

Crown studied what a door on a stand-up forklift does to the time required to get off a lift and found that the door added about ½ second to the average, non-emergency user.[24]  Thus, Crown operator, getting off the lift 100 times a day, adds fifty (50) seconds of "non-productive" time to the entire day.[25]

---

[23] Dr. Meyer's report p. 126 attached as Exhibit "9".  See also Dr. Meyer's affidavit attached as Exhibit "11".

[24] Q:  The study that Crown did -- and you alluded to this earlier -- about what a door does to the time required to
    get off a lift truck is it adds about half a second to the average nonemergent user; is that fair?
(Deposition of Ronald A. Grisez, *Johns v. Crown*, p. 164, lines 11-15 attached as Exhibit "1").

[25] Q:  The study that Crown did -- and you alluded to this earlier -- about what a door does to the time required to get
    off a lift truck is it adds about half a second to the average nonemergent user; is that fair?
  A:  I think it's the average in a laboratory setting, looking at a light, reacting to the light and jumping off the truck.
    I believe that was the average difference between with and without a door.
  Q:  So if you're averaging of 100 times a day is right, then that would average 50 seconds a day that would be
    increased if there was a door just on the average operator's day; is that fair?
  A:  Looking at it from that perspective, it sounds like that makes sense, yeah.
(Deposition of Ronald A. Grisez, *Johns v. Crown*, p. 164, line 11 to p. 165 line 3 attached as Exhibit "1").

As indicated above, Crown's stated reason for not protecting the left lower extremity is the need to "jump" in case of off-dock and tip over accidents.  However, other reasons Crown proposed are non-events or simple one-time observations by a director of product safety, Dan Dunlop.  Additional reasons include a "guillotine effect"[26]  if the door is impacted; intrusion with entrapment if the door collapses during an impact;[27]and snagging the operator in an emergency.[28] However, these events have never happened.

Additional disconcerting and perplexing reasons not to have a door include Mr. Dunlap's (a former director of product liability) observation that an operator got "hot" thus enticing him to open the door[29] and a door gave the operator a false sense a security thereby causing the operators to not look and clear the path of travel before moving the lift.[30]

Crown has concerns about adding a door for events that have never happened and one-time observations are baffling.  But yet the most common injury, a left leg crush or amputation, that **Crown has proven to prevent by adding a door,** is if no moment.[31]

---

[26] Q:  The next one that I've seen is operators will stick their feet out, and with a door, there could be a guillotine
        effect if the door is impacted?
   A:  That's correct.
   Q:  But you're not aware of a single incident of this happening on a Crown lift truck, are you?
   A:  That's correct.
(Deposition of Ronald Grisez, *Johns v. Crown* p. 26, line 22 to p. 27 line 5 attached as Exhibit "1").
[27] *Id* at p. 228 lines 4-18.
[28] *Id* at p. 28 line 19 to p. 29 line 1
[29] Q:  Another basis that you provided is that heat will build up inside the operator area which would entice the
       operator to open the door; is that correct?
   A:  That's correct.
(Deposition of Ronald Grisez *Johns v. Crown,* p. 29, lines 2-6 attached as Exhibit "1").
[30] Q:  The next item that you've used or the next basis that you've used as a basis for saying doors are inappropriate
        is a false sense of security; is that correct?
   A:  That's correct.
(Deposition of Ronald Grisez, *Johns v. Crown,* p. 31, lines 7-21 attached as Exhibit "1").
[31] Q:  And I think I remember seeing this. Crown repeatedly sent letters trying to convince these companies that
      were making these special-order doors that it wasn't a good idea to put doors on them, right?
   A:  I know there was communication with Kmart and Dale Manzel to kind of voice our opinion that we thought
        going with the doors was not the best choice.
   Q:  And ultimately Crown made the decision not to even offer doors at all, true?
   A:  I made that decision in 2010 with Ford. Ford, at the time, was the only customer that Crown was still
        providing the special-order doors.

A door does not impact the utility of the forklift other than adding 50 second of unproductive time.  The gravity of harm and risk of harm are great and foreseeable.  The costs to either retrofit the door or to add a door in the initial manufacturing process is minimal.

Dr. Meyer's alternative simple design allow Dawson's left leg to remain stable and attached to the floorboard and contemplates use of the right foot brake which is protected by the adjacent wall of the RM6000.  Moreover, in this case, after Dawson determined that plugging was not working (and even turned his head to look at the joy stick, no doubt in disbelief)[32] and lifted his left leg completely off the left foot brake – it was too late.  His leg was "tossed out", "jerked", "propelled" or "thrown out" of the machine pinning it between the pole and machine. If Crown had simply transposed the left brake and right sensor, there would have been no reason for Dawson to lift his left leg.  Further, if Crown had attached its door to the machine, there would have been no injry.

### Risk Utility Analysis – Specifically

In his affidavit, Dr. Meyer's explains that the utility of the forklift is not compromised in anyway and that the risk of severe harm to plaintiff's left leg is non-existent or greatly diminished.

- The addition of a door to the stand-up forklift Mr. Vallee was using would not affect its utility. Doors have been sold and added to stand-up forklifts for years. There has been no outcry from users that doors diminish the usefulness of the forklift or somehow impede its ability to perform its function to lift, move, and lower material. Doors still allow for free and easy egress from the forklift. There have been a number of arguments against adding a door, and I discussed these extensively within my report at pages 113 -122. From a utility and functionality standpoint, there are no valid reasons to exclude a door.

---

Q:  And if somebody now said, hey, we want a door, you would say no, we're not going to sell you the lift truck?
A:  That's correct.
(Deposition of Ronald Grisez, *Johns v. Crown,* p. 120, line 13 to p. 121 line 5 attached as Exhibit "1").
[32] Eyewitness, Quinn Fassbender, confirms Dawson turned his head and looked at the control while Dawson was in the process of losing control of the machine.
(See attached signed statement of Quinn Fassbender attached as Exhibit "11").

- Likewise with my proposed modified foot controls, there is no loss in the truck's utility or functionality. Changing the logic for how Crown's foot controls work would in no way affect the forklift's functionality. Rather, how the foot controls in the operator compartment are utilized to ensure the operators maintain their position safely within the truck as well as to brake the truck are modified without compromising utility. The Hyster-Yale foot control design actually improves the utility of the truck in that there are not pedals that an operator must stand on so the operator is more free to adjust their position while operating the forklift. In addition, the Hyster-Yale design adds the beneficial element of a brake that is applied in an intuitive manner by pressing it, similar to how one would apply the brake in an automobile.

- Nor would a backrest presence sensor compromise the utility of the forklift in any manner. As discussed in my report (p. 125 -127), the backrest presence sensor would help ensure operators are maintaining the five-points-of-contact stance that Crown desires and considers normal operating position. Testing performed by Raymond has shown that operators have no difficulties maintaining contact with the backrest. As I have indicated previously, for precise, low-speed maneuvering, a cut-off of the switch's operation can be implemented so that the backrest presence sensor does not affect the functionality of the forklift.

**Louisiana cases cited by defendant are factual divergent from
the *Vallee* case and provide little guidance.**

*Seither v. Winnebago, Ind.*, 853 So.2d 37 (La. Ct. App. 2003) is totally inapposite to the instant case. *Seither* was a crash worthiness case where the plaintiff's expert proposed significant modification of the Winnebago at issue. Plaintiff's expert's first alternative design sought to "stretch the front end of the [Winnebago] out" (*Id*. at 40) and to do so he "considered a minivan with unibody construction as a model or basis for his alternative design." *Id.* Winnebago tested the plaintiff's design and concluded the occupants of the Winnebago would be killed under that alternative design.

The second alternative design that the plaintiff's expert to "stretch the front end" was "a mock-up of a Dodge Ram van." *Id*. at 41. The Court noted that with the design alternative "[t]he record is devoid of any technical drawings, calculations, scientific study, photographs or the

publication of any engineering principles as to this proposed alternative design." *Id.*  Further, in *Seither*, plaintiff's proposed second alternative design did not prevent plaintiff's injury.

In the *Scordell v. Louisville Ladder Group*, CA. No. 02-2565 (E.D. La.) Oct. 23, 2003, this Court noted that plaintiff failed to clearly identify a specific alternative design and merely pointed to a photograph of a heavy duty ladder that was safer because of a stiffner, a boot and a protective collar. *Id.* at *23.  This Court determined plaintiff's expert "failed to clarify how a stiffner, boot or collar would apply to the incident model." *Id.*  Nor did the plaintiff identify how those devices "would be placed to prevent an accident like *Scordell's*." *Id. Scordell's* expert admitted that this was "not a design defect case." *Id.* at *23-24.  Moreover, the Court stated a risk-utility analysis was not presented for consideration. *Id.* at *24.

*Gray v. Industrial Plant Maintenance* is not applicable as plaintiff in *Gray* failed to even present an expert report to substantiate his opinions.

In *Lacoste v. Pilgrim*, Case No. 2:07-cv_02904-SSV-SS, R.Doc 135, this Court granted summary judgment where the plaintiff's evidence of an alternative feasible design for an alleged defective adult bed sheet manufactured by ADT was "a printout from the Amazon.com website featuring a brand of wearable polyester baby blanket – described as a "sleepsack which is intended to be zipped around a baby like clothing."[33]  The ad attached claimed the 'sleepsack' was fire resistant.  Further the claim against the manufacturer of the trailer was dismissed for a complete lack of evidence.  The Court noted that a contextless photograph of a bathroom escape hatch and an unsworn opinion from someone in the RV business are not significant evidentiary basis to allow a jury to even consider whether an alternative design existed at the time the trailer left the manufacturer's control.[34]

---

[33] Doc 135 p.10
[34] Doc 135 p.16

It is undisputed that plaintiff offered specific evidence of an actual design that existed when the stand-up, open compartment forklift left Crown manufacturer in June of 2016. Plaintiff does not offer a conceptualized possibility – plaintiff offers a specific door that has been used in real-life operations in multiple locations and which has a perfect safety record in connection relative to injuries to left lower legs. There have been zero injuries to left lower extremities when a Crown door is placed on a Crown stand-up forklift. The following photograph is of a Crown forklift with a Crown door and is reference in Dr. Ziernicki's report as Figure 22 which is reproduced herein:



Moreover, Dr. Ziernicki placed a door on a Crown forklift and conducted egress studies. Dr. Ziernicki describes the door as follows:

> I have performed my own testing of operator egress time on stand-up forklift equipped with a door. I equipped a stand-up forklift produced by Crown with a readily available rear occupant compartment guard door that was manufactured by Raymond. Testing of the egress time from the forklift was performed without a door, with the spring-loaded Raymond door, and the spring-loaded Raymond door with a latching system designed by myself. The egress time was tested with 5 different test subjects, which egressed from the forklift 5 times for each test condition. In all, 75 egress tests were performed. The average egress time without a door was 0.76 seconds, with a spring-loaded door the egress time was 0.81 seconds, and with the latched door the egress time was 0.85 seconds. The overall increase of time to egress from no door

to a spring-loaded designed door was 0.05 seconds.  The overall
increase of time to egress from no door to designed latching door
was 0.09 seconds.  The latching door designed by me was designed
to minimize egress time.  I published these findings in a peer-
reviewed paper through ASME in 201468.  I concluded, it is
technically feasible to manufacture a latching door that does not
significantly affect egress time and it is my opinion the safety
benefits of a door far outweigh the minimal increase in egress time.
I also recognize and accept the safety benefits of a spring-loaded
door and believe a door (spring or latch closed), at a minimum,
would improve the overall operator's safety from lower limb
injuries.
(Dr. Ziernicki's report p. 46 attached as Exhibit "12").

As Dr. Ziernicki's report states, Crown placed into its stream of commerce 686 Crown

forklifts with doors.  Mr. Grisez acknowledged that numerous corporate customers purchased

Crown stand-up riders with a door and there was not a single report of a left leg injury.  And too,

where are the complaints lodged **by customers** that doors impede jumping during off-dock and

tip over accidents?  There are none.

In its motion, Crown poses some unanswered questions and concerns that militate against

the use of a door.  However, again, not a single incident or concern Crown referenced manifested

itself during the use of Crown doors.  That is, there were no snag events, intrusions, entrapments,

guillotine-like injuries with the use of a door.  Mr. Grisez admits these are, in effect, hypothetical

non-events.  Further, a buildup of heat in the operator's compartment and the concern about a

door creating hazardous driving is backed purely on observations by Crown direct of safety Dan

Dunlap.  As the photographs attached[35] show, the Republic warehouse is an open air facility.

And this is New Orleans.  The Court can take judicial notice that this is an extremely hot climate

and with or without the door, the operator will sweat.  The penultimate feigned "concern" about

the use of a door is Crown's concern that the door causes distracted driving.  The connection

---

[35] Photograph of the convey belt which is attached to Donald Raziano's first declaration dated 10/22/21 attached as
Exhibit "13" *in globo.*

between hazardous driving and a door is simply head-scratching.  Further, plaintiff has offered a risk-utility analysis for all three alternative designs.  The cost to add a door, transpose the brake and add a sensor are minimal.  The time lost to open a door and effects on worker's production are minimal.  The gravity and risk of harm clearly outweigh the additional postulated concerns mentioned in Crown's brief.

### Conclusion

Crown has nearly 700 accidents documented wherein use of a stand-up forklift resulted in severe lower left leg injuries.  The word "accident" is defined as an unfortunate incident that happens unexpectedly and unintentionally, typically resulting in damage or injury.  These accidents result because of the environment where forklifts are placed – narrow aisle environments where impacts with stationary objects will occur.  Of course, as evidenced by the numbers alone, these accidents cause severe left leg injuries.  This is a reasonably anticipated use that must be addressed by the manufacture of the machine.  And it has not and will not be addressed unless the court allows this case to go forward.

At this juncture, it is important to reference the report and affidavit of Dr. John Jeka, a man who has engaged in the study of human balance for most of his professional life.

In an emergency situation or unexpected situation, Crown asks the operators of the truck to lift their foot off the brake pedal and doing so creates an involuntary response wherein the left lower extremity seeks balance.  Crown simply cannot accept that this happens time and again, lawsuit after lawsuit.  Rather than address, quite frankly, an obvious design defect, Crown has decided to re-engineer the human body and call an involuntary reflex of the operator seeking balance, a voluntary or intentional action.

As stated above, this is an obvious design defect and plaintiff proposes three (3) alternative designs that have and will end the mutilation of left lower extremities of people like Dawson Valle, a young man fresh out of high school who wanted to work in an open air environment.

The designs that plaintiff has proposed are simple and cost effective.  The designs do not affect the utility of the vehicle in any drastic way – the cost of a door, transposing the brake and sensor and/or adding a back sensor are nominal costs when compared the risk and gravity of harm to operators.

Plaintiff figuratively and literally prays that the defendant's motion for summary judgment on the issue of alternative design claims use be denied.

Respectfully submitted,

By: *s/Patrick G. Kehoe, Jr.*
Patrick G. Kehoe, Jr. #14419
3524 Canal Street
New Orleans, LA 70119
(504) 588-1110
(504) 588-1954 Fax

WARSHAUER LAW GROUP, P.C.
Michael J. Warshauer GA Bar #018720
*Admitted Pro Hac Vice*
2740 Bert Adams Road
Atlanta, GA 30339
(404) 892-4900
(404) 892-1020 Fax
*Counsel for Plaintiff Dawson Vallee*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading was filed electronically with the Clerk of the Court using the Court's CM/ECF system and a copy sent to all counsel of record by electronic means this 1st day of November 2021.

*s/Patrick G. Kehoe, Jr.*
PATRICK G. KEHOE, JR.