# AFFIDAVIT

**STATE OF ILLINOIS**

**COUNTY OF KANE**

BEFORE ME, the undersigned authority, personally came and appeared:

### John E. Meyer, Ph.D., P.E.

who after being duly sworn did depose and state:

1. I am John E. Meyer, Ph.D., P.E. an adult suffering under no disabilities. I have personal knowledge of the facts set forth in this affidavit which I make to point out Crown's misrepresentation of my qualifications and methodology in the *Vallee v. Crown* matter.

2. I have read Crown's motion to exclude my testimony. Crown states that, "First, he does not possess the requisite experience or qualifications to offer an expert opinion in the field of fork-lift or stand-up rider lift truck design." This is completely incorrect, and tries to make the improper distinction that safety- and design-related concepts somehow apply to stand-up forklifts differently than to other machines.

3. My educational qualifications consist of multiple, directly pertinent academic degrees. I earned a Bachelor of Science degree in physics from Bethel College. Physics is the fundamental science upon which most engineering principles rest. My Master of Science and Ph.D. degrees in mechanical engineering were obtained from the Massachusetts Institute of Technology (MIT), commonly regarded as the number one engineering school in the world.

4. Further, I am a licensed Professional Engineer (PE). The PE license is the engineering profession's highest standard of competence. To become licensed, one must complete a four-year college degree from an accredited school, work under a Professional Engineer for at least four years, and pass two intensive competency exams. To retain my PE license, I am required to maintain and improve my skills. In contrast and of note, Ron Grisez, Crown's design "expert," is not a Professional Engineer.

5. For the past 28 years, I have used my engineering qualifications to actively investigate accidents, mishaps and failures from an engineering perspective. My career has focused on analyzing and understanding engineering designs to assess what role, if any, a particular item may have played in an accident or failure. This means using the physical principles and engineering concepts I obtained in my education and throughout the course of my career and applying them to a particular event, machine, device, component or process. These very same principles and concepts were used in my design analysis of Crown's forklift in the Vallee matter.

6. Critically, a stand-up forklift is a machine and must be treated as such. Engineering design principles and methods universal to machines such as risk analysis (discussed in


EXHIBIT 10

my amended report at p. 55 – 61), reasonably foreseeable misuse (p. 51 – 55), acceptable risk (p. 48), ALARP (p. 69) and the hazard control hierarchy (also referred to as the hierarchy of controls and the design safety hierarchy) (p. 61 – 65) apply to stand-up forklifts in the same manner as any other machine. As I indicated in my amended report on page 33, American National Standards Institute (ANSI) B11.0 *Safety of Machinery* explicitly states in its Foreword that, "The concepts and principles contained in this standard can be applied very broadly to a wide variety of systems and applications." In April 2020 in the journal *Professional Safety*, Mr. Bruce Main, PE, CSP noted this widespread applicability:

> "The beauty of the risk assessment process for a standard such as ANSI B11.0 is that it applies broadly. Although the hazards and subsequent risk reduction measures vary greatly from one application to another, the overall process of identifying hazards, assessing risks, reducing risks to an acceptable level, documenting the results and following up remain consistent across all applications....
> The author has not encountered a situation in which the risk assessment process cannot be applied." (p. 39)

That is what I did; I utilized the aforementioned concepts and principles in performing my analysis. To suggest that I am somehow not qualified to apply these fundamental design analysis techniques because I haven't previously applied them specifically to stand-up forklifts completely misunderstands engineering design and the principles and methodology I utilized.

XX. Rather, it appears to me that Crown and its defense team is trying to silence me not because of my qualifications but because I am exposing glaring omissions on their behalf. For example, Mr. Grisez has recently admitted in the Johns vs. Crown case that Crown has never performed or documented a formal risk analysis for the subject forklift, tasks required by the ANSI B11.0 standard since 2010.

> Ronald Grisez September 28, 2021
> Page 130
> 22 Q. Did Crown do a risk assessment as
> 23 it developed the side-stance stand-up forklift?
> 24 A. So back in the '60s, I don't know
> 25 if they called them risk assessments back then,
> Page 131
> 1 but there was a design analysis that did take
> 2 place when they looked at what was in the field
> 3 at the time and then, you know, how they came
> 4 up with the side-stance position. That was all
> 5 analyzed for sure.
>
> Page 134
> 2 Q. Well, was any formal risk

> 3 assessment done at any point in time after the
> 4 truck had been -- after the side-stance lift
> 5 truck had been put into service?
> 6 A. Besides the original design
> 7 analysis that went into the original truck?
> 8 Q. Right.
> 9 A. I'm not aware where that was
> 10 redone.
> 11 Q. Was the risk assessment that was
> 12 done during the design process put into any
> 13 kind of formalized documentation?
> 14 A. The design analysis that -- I'm
> 15 not aware of where that was all written down.

7. Crown's defense team argues that I have failed to identify specific alternative designs. This is not accurate. Regarding a door, I present many specific door designs that have been included in stand-up forklifts in my report (p. 106 – 109). Doors can and have been implemented on stand-up forklifts, including Crown forklifts. It was not necessary for me to reinvent the wheel, so to speak, to show that a door can and should be placed on the Crown stand-up forklift operated by Mr. Vallee.

8. As I indicated in my report (p. 109 – 111), the addition of a door offers three primary functional benefits pertaining to lower left leg injuries. It serves as a visual and tactile reminder of the boundaries of the operator compartment and a reminder for the operator to keep their leg inside. It also serves as a physical barrier to prevent the foot from leaving the occupant compartment. While doors can vary in the material from which they are constructed and how they are made to be kept shut, they possess several pertinent design elements all of which are shown in the doors referenced in my report. The doors are hinged on either the right or left side of the operator compartment opening (when viewed from the rear). Either side is acceptable. If hinged on the left side, an operator's left foot and leg will meet with higher resistance to the door's opening if the door is unlatched. All doors cover the opening to the occupant compartment to a height approximately as tall as the sides of the forklift main body. A spring returns the door to the normally-closed position. Other door elements are not critical to the functionality of the door in terms of operator left lower leg protection.

9. A representative specific door design that I endorse is modeled after the door used by Railsback et al. in their 2014 study published in the Proceedings of the ASME 2014 International Mechanical Engineering Congress and Exposition (IMECE2014-38847). The door is an aluminum off-the-shelf unit commercially available through Raymond. Railsback et al. adapted it to a Crown sidestance stand-up forklift by welding the door hinges to the frame of the forklift. The same adaptation can be performed on a Crown RM6000 such as the one utilized by Mr. Vallee. Railsback reports the specifics of the door: 28 lbs, approximately 34 in tall 24 in wide and 0.35 in thick. The hinges are spring

loaded and adjustable regarding the force required to open the door. Images of this door in the open and closed configuration are shown below.

 

10. Regarding my proposed changes to the functionality of the foot brake arrangement, Crown appears to have conveniently forgotten that I proposed two alternatives. One is already in production by Hyster-Yale and called the Operator Sensing System. See pages 124 – 125 of my amended report. Note that I have recently seen, inspected and operated a Yale forklift equipped with this design. My second alternative is a change in the functionality of the existing foot pedals in the floor of the operator compart. It is remarkably simple, does not require any physical changes, and consists of two primary components. First, make the current (right foot) presence sensor into the primary brake. According to Mr. Grisez's testimony in the McHale v. Crown case, this is doable just by changing the logic:

> Ronald Grisez March 12, 2020
> Page 68
> Q. Okay. If you chose to, you could
> 18 make the presence sensor without changing any
> 19 of the physical design of the product apply the
> 20 service brake?

Page 4 of 10

21 A. The capability --
22 Q. To act just like the service
23 brake?
24 A. We could take that sensor
25 information and change the logic, that is
Page 69
1 possible. It's not something that we would do.
2 But the capability, I mean, could be there.

The DMS1 switch is the current Operator Presence Switch under the right foot of the operator. The BRS1 switch is the current Left Brake Pedal Switch under the left foot of the operator. The DMS1 switch operates in the same manner as the BRS1 switch as described in Crown's Service and Parts Manual for the RM6000 and shown below.

DMS1, Operator Presence Switch
Location: under the floorboard, right foot pedal
Purpose: limits truck operation when the operator's
foot is not in the proper position for stand up operation
Data: wired normally closed, held open. Switch is actuated
(switch closed) when operator's foot is on the
pedal. (p. 106, CROWN000210)

BRS1, Left Brake Pedal Switch
Location: under the floorboard, left foot pedal
Purpose: allows the operator to actuate the brake
through ACCESS 4
Data: momentary contact wired normally closed, held
open. Brake is applied (switch is open) when the pedal
is not depressed. (p. 104, CROWN000208)

In my design, the logic for the opening of the normally closed, right foot operated DMS1 switch would be changed to the logic and functionality of the opening of the normally closed, left foot operated BRS1 switch. The braking effect would be as described in the Service and Parts Manual for the RM6000 (p. 527, CROWN000631).

The second component of this change in foot pedal design would be to discourage use of the left foot as a brake, causing the left foot pedal to be thought of and treated as an operator presence sensor, and encourage the left foot to remain in contact with the floor. However, importantly, the functionality of the left foot pedal would remain the same. That is, if the foot is lifted off the left foot sensor, braking would occur as it currently does.

11. Regarding a backrest presence sensing switch, I did not do detailed design for something as simple as a switch. We know from testing commissioned by Raymond (a competitor to

Crown), discussed in my report on page 126 of my report, that operators average about 10 pounds force on the backrest in their machines. Sit-down forklifts have required operator presence sensing in the seat of the forklift since 2005. The right foot floor "pedal" in the subject forklift is a presence sensing switch. The Entry Bar has a presence sensing switch. Refrigerators, microwaves, and ovens have switches that sense when the door is open to turn on a light. The idea of using a switch for sensing the presence of something is not novel. I did not specify a specific switch design as I did not feel it was necessary to present such specifics. Rather, I have described the logical function of such a switch as modeled after Crown's Entry Bar, adding that low-speed cut-off of the switch's operation could occur to accommodate operator positional flexibility for precise very low speed maneuvers such as during the picking or placing of a pallet in racking (report p. 127).

12. Importantly, although my design alternatives do drastically reduce the risk for left leg crush injuries, none of my alternative designs negatively affect the utility of the stand-up forklift nor are they unreasonably difficult or expensive to implement. As discussed in my report (see p. 69), the general criterion for achieving acceptable risk is the concept of ALARP, as low as reasonably practicable. This is the level of risk which can only be further lowered by a disproportionate increase in resource expenditures or loss of functionality relative to the incremental reduction in risk achieved.

13. The addition of a door to the stand-up forklift Mr. Vallee was using would not affect its utility. Doors have been sold and added to stand-up forklifts for years. There has been no outcry from users that doors diminish the usefulness of the forklift or somehow impede its ability to perform its function—to lift, move, and lower material. Doors still allow for free and easy egress from the forklift. There have been a number of arguments against adding a door, and I discussed these extensively within my report at pages 113 – 122. From a utility and functionality standpoint, there are no valid reasons to exclude a door.

14. Likewise with my proposed modified foot controls, there is no loss in the truck's utility or functionality. Changing the logic for how Crown's foot controls work would in no way affect the forklift's functionality. Rather, how the foot controls in the operator compartment are utilized to ensure the operators maintain their position safely within the truck as well as to brake the truck are modified without compromising utility. The Hyster-Yale foot control design actually improves the utility of the truck in that there are not pedals that an operator must stand on so the operator is more free to adjust their position while operating the forklift. In addition, the Hyster-Yale design adds the beneficial element of a brake that is applied in an intuitive manner by pressing it, similar to how one would apply the brake in an automobile.

15. Nor would a backrest presence sensor compromise the utility of the forklift in any manner. As discussed in my report (p. 125 – 127), the backrest presence sensor would help ensure operators are maintaining the five-points-of-contact stance that Crown desires and considers normal operating position. Testing performed by Raymond has shown that operators have no difficulties maintaining contact with the backrest. As I have indicated

previously, for precise, low-speed maneuvering, a cut-off of the switch's operation can be implemented so that the backrest presence sensor does not affect the functionality of the forklift.

16. In addition, none of my proposed alternative designs would require an unreasonable or disproportionate expenditure of resources to implement relative to the benefit they provide. Mr. Grisez has recently estimated that to retrofit a forklift with a door would be in the range of $750 to $1,000 (Ronald Grisez deposition testimony, Johns vs. Crown, September 28, 2021, p. 162). This is minor relative to the overall cost of the Vallee machine, $38,176.60. Reprogramming of the functional logic of Crown's current foot pedals, requiring no physical changes, would be a minor expense. Implementing a system modeled after the Hyster-Yale design would involve the addition of three optical sensor systems similar to those used in garage doors to prevent the door's inadvertent closure on an object in its path. The hardware is not prohibitively expensive as evidenced by its use by Hyster & Yale. The underlying logic to the use of these sensors is already present in Crown's existing system. Likewise with a backrest presence sensor. Operator presence sensors have been implemented in sit-down forklifts for years without undue expense. With the Entry Bar as a model, implementing the logic for such a sensor's use would not be a challenge.

17. In contrast, implementing my alternative designs dramatically reduces the risk of lower left leg crush injuries, the most common serious injury encountered on stand-up sidestance forklifts (see Grisez deposition testimony, Johns vs. Crown, September 28, 2021, p. 143). Real-world experience with doors that have been used on stand-up forklifts indicate doors alone are remarkably effective in preventing exposure to left leg crush injury. My proposed foot pedal modifications encourage forklift operators to keep their left foot in the safest position—on the floor inside the occupant compartment—and takes action to brake the forklift to a stop when that position isn't maintained, again reducing the risk of operator left leg crush injury. Finally, the backrest presence sensor ensures the operator maintains the five-point stance desired by Crown, promoting operator stability and enhancing safety.

18. Crown's defense team argues that I have not done any testing to support my opinions. I did not do any testing because I did not need to do any, instead relying on real-world use or testing performed by others. I relied on real-world use of doors on stand-up forklifts by Ford, Newell-Rubbermaid, The Gap, and others (p. 11 – 21). Doors have been real-world tested and found to be phenomenally effective at eliminating left leg crush injuries. In fact, for doors placed on Crown forklifts, Crown cannot point to a single left leg crush injury occurring. I have also relied on testing of others, such as the operator compartment egress testing performed by Railsback et al. discussed above (IMECE2014-38847).

19. The modified foot control design has been real-world tested as well. The Hyster-Yale Operator Sensing System and brake design is in production and functional. I have seen and operated a Yale stand-up forklift with this system. In terms of changing the function of the currently-present foot switches, no physical change would be mandatory, but rather

Page 7 of 10

a change in control logic would be implemented when an operator is stepping on the switch or not. Testing of this change in logic is not necessary to understand the functionality that a change in logic such as I am proposing would bring.

20. Crown's defense team argues that my opinions are directly contrary to the standards published by the American National Standards Institute (ANSI) and thus are not "generally" accepted in the relevant technical community. In my report (p. 32 – 49), I painstakingly and thoroughly discuss engineering standards, including multiple ANSI standards. I specifically discuss:

    - ANSI/ITSDF B56.1 *Safety Standard for Low Lift and High Lift Trucks;*
    - ISO 3691-1 *Industrial trucks — Safety requirements and verification — Part 1: Self-propelled industrial trucks, other than driverless trucks, variable-reach trucks and burden-carrier trucks;*
    - ANSI/ISO 12100 *Safety of machinery — General principles for design — Risk assessment and risk reduction;* and
    - ANSI B11.0 *Safety of machinery.*

    I cite multiple other ANSI standards and technical reports within my report such as:
    - ANSI B11.19 *Performance Criteria for Safeguarding;*
    - ANSI B11.TR3 *Risk Assessment and Risk Reduction — A Guide to Estimate, Evaluate, and Reduce Risks Assoited with Machine Tools;*
    - ANSI/ASSE Z590.3 *Prevention through design;*
    - ANSI/ASSE Z690.3 *Risk assessment techniques;*
    - ANSI/ASSE Z10 *Occupational health and safety management systems;*
    - ANSI/RIA TR R15.306 *Task-based Risk Assessment Methodology;* and
    - ANSI B11.TR1 *Ergonomic guidelines for design, installation, and use.*

    In regards to these ANSI standards and the ISO 3691-1 standard, as I discussed in my report at page 39 in the last paragraph of section II.E.2, it is the B56.1 standard that stands out and stands alone as not endorsing and requiring the "generally accepted" engineering design practices of performing risk analysis, designing for reasonably foreseeable misuse, promoting use of the hazard control hierarchy, achieving acceptable risk, and incorporating human factors into design.

21. My analysis rests solidly on the ANSI standards cited above (sans B56.1) and other pertinent and generally accepted technical engineering references, sources, and methods cited and described throughout my report. To the extent that my opinions differ from or are in conflict with ANSI B56.1, it is because of my reliance on the principles, methods, and techniques contained within these other ANSI standards and technical engineering references with which ANSI B56.1 also conflicts.

22. Crown's defense team has indicated that my opinions have not been published or subjected to peer review in any form, indicating they are somehow unreliable or unworthy of consideration. My opinions are in accord with numerous other engineers. As indicated in the prior paragraphs, my opinions were developed as a consequence of my

thorough analysis of the information centered upon a risk analysis and safety assessment using multiple ANSI standards and other generally accepted analysis methodologies and techniques as a guide.

23. Crown's defense team has slanderously alleged that my opinions are, "driven solely by litigation and a desire to meet the needs of the attorneys who retain him." How do Crown's attorneys purport to know what my motivations are? First, in a non-litigation context, I studied the issues related to stand-up forklift left leg crush injuries for a considerable length of time. It was this work that allowed me to become more knowledgeable of stand-up forklift safety issues and the environments in which they operate. I became certified to operate a stand-up sidestance forklift.

24. Second, as a Professional Engineer and member of the National Society of Professional Engineers (NSPE), I endeavor to uphold the NSPE Code of Ethics for Engineers. The first of six fundamental canons is to hold paramount the safety, health, and welfare of the public. As a Professional Engineer and having done the analysis I have, I believe I am obligated to illuminate issues related to stand-up forklift design as it certainly affects the safety, health, and welfare of the public. My opinions have been formulated as a result of my extensive work and not in any fashion by any attorney telling me what my opinion should be or because I am working on a matter that is in litigation. To suggest otherwise is patently false.

25. In addition, I have written to OSHA and have informed it of the work that I have performed, the changes that have occurred over the past decades since it last addressed specific issues pertaining to stand-up forklifts such as the proliferation of the use of trailer restraints at loading docks and the use of dynamic stability control measures such as Crown's Intrinsic Stability System, and urged OSHA to revisit the level of protection afforded to stand-up forklift operators and to reexamine its rules related to stand-up forklifts.

26. I have not interacted with or attempted to directly address the B56.1 committee because I see the B56.1 standard as rigged (see my August 13, 2021, deposition testimony in this case at page 205). Voting manufacturer members, such as Crown, are predisposed in favor of maintaining the status quo and against anyone trying to challenge positions they believe it is in their best interest to maintain. In the March 12, 2020, deposition testimony in the McHale vs. Crown case of Crown's Mr. Steven McDermott, vice chairman of the B56.1 committee from 2009 to 2012, and chairman since 2012, Mr. McDermott indicated he would simply vote no on any challenge to any proposal that would require a rear entry guard door on stand-up forklift products, effectively quashing it (p. 31 of transcript).

_____
John E. Meyer, Ph.D., P.E.

Sworn to and subscribed
before me this 29 day
of October, 2021.

_Mary Pappas_
Notary Public - Print Name: Mary Pappas

Bar/Notary No.: 758996

My Commission Expires: 12/30/23

OFFICIAL SEAL
MARY PAPPAS
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:12/30/23